# IN THE SUPREME COURT OF IOWA

No. 18–0002

Filed April 24, 2020

**STATE OF IOWA,**

    Appellee,

vs.

**EARL BOOTH-HARRIS,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Des Moines County, John G. Linn, Judge.

A defendant seeks further review of a court of appeals decision rejecting his due process challenge to a police photo array identification procedure and the court's failure to grant relief on his claim that trial counsel was ineffective for failing to request different jury instructions on eyewitness identifications reflecting scientific research. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender (until withdrawal), and Nan Jennisch, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

**WATERMAN, Justice.**

In this appeal, a defendant convicted of first-degree murder based in part on eyewitness testimony seeks a new trial on two grounds. First, he contends the police used unduly suggestive photographic identification procedures and the district court erred by failing to grant his motion to suppress the resulting identification. Second, he contends his trial counsel was ineffective for failing to request more robust jury instructions on eyewitness identifications that reflect modern scientific research. The district court, without objection, had given the Iowa State Bar Association (ISBA) Uniform Criminal Jury Instruction 200.45 on eyewitness identification. We transferred the case to the court of appeals, which affirmed his conviction while preserving his ineffective-assistance-of-counsel claims for possible postconviction proceedings. We granted the defendant's application for further review.

On our review, we decline the defendant's invitation to change our constitutional precedent to further limit the admissibility of eyewitness identifications following police photo arrays. We determine that the double-blind procedures used in this case, with an appropriate admonition given the witness, were not unduly suggestive. Unlike the court of appeals, we determine the record is adequate to decide the ineffective-assistance-of-counsel claim challenging ISBA Instruction 200.45, and we reject the claim on the merits. For the reasons explained below, we affirm the district court's judgment of conviction.

## I. Background Facts and Proceedings.

The trial testimony established the following facts. On February 16, 2015, in Burlington, Iowa, an argument broke out between Deonte Carter and Terrance Polk in the front yard of Rita Lewis's home. Carter accused Polk of breaking into his home and stealing a pair of sneakers. Lewis told

the men to take their fight elsewhere, and the disputants dispersed. Polk and Carter then communicated through Facebook and set a time and place to fight.

That afternoon, Carter, along with his cousin, Donnell Watson, and friend, Edward DeWitt, arrived at the park on 7th and Elm in Burlington. Polk showed up with several men who had accompanied him earlier at the Lewis house. All of the men were the same race. Carter and his group were approached by a shooter wearing a black stocking cap whom Watson later identified as Earl Booth-Harris. The shooter and Carter engaged in a brief exchange of words with Carter telling the shooter, "[D]o what you gotta do." The shooter opened fire, hitting Carter multiple times. Watson ran away when the shooting started. When it stopped, he returned and found Carter on the ground bleeding from bullet wounds. DeWitt called 911. Watson found a .40 caliber gun on the ground next to Carter and took it to Lewis's house. Police recovered that weapon later. Carter died due to gunshot wounds to his chest, abdomen, and back. Carter was shot by a .45 caliber gun.

The same day, Booth-Harris presented to a hospital in Monmouth, Illinois, for a gunshot wound to his leg. Booth-Harris was shot with a .40 caliber gun. In an interview with the police at the hospital, Booth-Harris stated that he was in the area of the shooting and saw an argument involving several men. He told police he heard gunshots and ran and while running away was shot. Booth-Harris told the police that he went home, changed clothes, and contacted his father, who took him to the Illinois hospital. Booth-Harris feared going to the hospital in Burlington where he might be shot. Booth-Harris denied participating in the shooting.

On the day of the shooting, Watson gave a statement to police and was presented with a photo array. A photo of Polk was included because

police suspected he was the shooter. This array did not include a photo of Booth-Harris. Watson did not identify anyone in these photos as the shooter. Watson was next presented with a single photo of Booth-Harris.[1] He denied knowing who Booth-Harris was.

Two days later, Watson was again interviewed and shown photo arrays prepared by Detective Josh Tripp. Detective Tripp "pick[ed] photographs of subjects that look[ed] similar to the suspect that [they] ha[d] at the time." Detective Tripp personally picked six photographs out of ten to twelve that he believed looked the most similar. Sergeant Chad McCune, who was not involved in the investigation and did not know who was a suspect, presented the photo array in a double-blind protocol. Sergeant McCune read to Watson a photographic admonition, which Watson signed before looking at the photos. The admonition states,

> You are about to view a photographic line-up. The person who committed the crime may or may not be included in it. While looking at the photographs, keep an open mind that the individuals may not appear exactly as they did on the date of the crime. Their hairstyles, facial hair, clothing, etc. may have changed. Also, photographs may not always depict the true complexion of a person, who may be lighter or darker than shown in the photo. The officer showing you the photographs has no knowledge of the incident. In the line-up process, the photographs will be shown to you one at a time and are not in any specific order. Take as much time as you need to look at each photograph. Even if you identify an individual, the officer will continue to show you all of the photographs. The officer is not allowed to tell you whether your choice, if you make one, is a suspect in the investigation. Do not tell other witnesses that you have or have not identified anyone.

---

[1]When presented with the picture of Booth-Harris, Officer Derek Schwandt testified,

> Q. Why did you show him the picture then? A. Well, we just had a shooting in Burlington and there's a subject with a gunshot wound. We don't know if he's a victim. We don't know if he's a suspect. We don't know if he's a bystander, so at that time, we're not sure what his involvement was.

A photo of Booth-Harris was included in this second array, and Watson identified him as likely being the shooter after quickly dismissing the other five photographs. Watson commented that he wanted to say Booth-Harris was the shooter, but he stated his eyes were smaller in the photo than they were the day of the shooting; however, Watson noted favorably the "strong jaw structure" of Booth-Harris and indicated that was the "only thing he could kind of see." Watson also called attention to Booth-Harris's eyebrows, stating that the eyebrows of the shooter were thicker. At this point, Watson said he had a fifty percent certainty and initialed the picture. Watson told the officer, "[Y]'all can like take another picture and show me."

The officers informed Watson that they were going to try to find more recent photos. While Watson was still at the station, Detective Tripp prepared another array. Sergeant McCune again administered the array and again read the admonition to Watson, which he signed. Watson again quickly dismissed the other photographs, and he identified Booth-Harris as the shooter. When asked about his level of certainty, Watson this time said he was seventy percent certain. Watson commented about "feelin' like" it was him. After an exchange between Watson and Sergeant McCune, in which Sergeant McCune stated that "feelin' like it" means more than seventy percent, Watson ended by stating he had one hundred percent certainty.

A search of Booth-Harris's home yielded evidence used at trial. Blood drops outside led into the home. A black stocking cap and bloody t-shirt were found inside the home. A .45 caliber shell casing was located on the ground outside the back door. The casing matched the .45 caliber casings at the scene of the shooting, indicating they were fired from the same gun. Additionally, live .45 caliber rounds were recovered from Booth-

Harris's home. An expert identified the live rounds as the same brand of casings as those at the shooting and opined the casings at the scene of the shooting and those at the Booth-Harris house were likely manufactured around the same time.

Booth-Harris was charged with murder in the first degree, in violation of Iowa Code section 707.2 (2015), a class "A" felony. Booth-Harris filed a motion to suppress the identification, arguing the procedure was impermissibly suggestive and a violation of his due process rights. The district court denied the motion to suppress. Watson testified at trial and identified Booth-Harris as the shooter. Booth-Harris was found guilty of first-degree murder and was sentenced to life in prison without the possibility of parole. Booth-Harris appealed, raising two issues. First, Booth-Harris claimed the district court erred in denying his motion to suppress Watson's in-court identification because the out-of-court identification was impermissibly suggestive and unreliable. Second, Booth-Harris claimed his trial counsel was ineffective for failing to request jury instructions similar to those adopted in *State v. Henderson*, 27 A.3d 872 (N.J. 2011).[2]

We transferred the case to the court of appeals, which affirmed Booth-Harris's conviction while preserving for possible postconviction relief action his "due process claim raised under the Iowa Constitution and his claim defense counsel should have requested a different eyewitness identification instruction." We granted Booth-Harris's application for further review.

---

[2]Booth-Harris's trial counsel offered no expert testimony on the reliability of eyewitness identifications, and his appellate counsel makes no claim Booth-Harris received constitutionally deficient representation based on the lack of such expert testimony.

**II. Standard of Review.**

We review constitutional challenges to eyewitness testimony de novo. *State v. Taft*, 506 N.W.2d 757, 762 (Iowa 1993). As we recently reiterated,

> "When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." We examine the whole record and "make 'an independent evaluation of the totality of the circumstances.'" "Each case must be evaluated in light of its unique circumstances."

*State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019) (quoting *State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018)).

Claims of ineffective assistance of counsel are reviewed de novo. *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018).

**III. Analysis.**

**A. The Motion to Suppress.** We begin with Booth-Harris's argument that the district court erred in denying his motion to suppress Watson's pretrial identification of him as Carter's killer. Booth-Harris contends the pretrial photographic identification procedures violated his due process rights under the Federal and Iowa Constitutions.[3] *See* U.S. Const. amend. XIV; Iowa Const. art. I, § 9. Booth-Harris has the burden of proving that the identification procedures were unconstitutionally suggestive or unreliable. *State v. Neal*, 353 N.W.2d 83, 86 (Iowa 1984).

We apply a long-standing, two-part analysis to challenges to out-of-court identifications, the same test set by the United States Supreme Court and utilized by most other states. *Taft*, 506 N.W.2d at 762; J.P. Christian

---

[3]The court of appeals determined that Booth-Harris failed to preserve error on his due process claim under the Iowa Constitution because he did not argue for a different standard in his motion to suppress. Booth-Harris argues that error was preserved in his motion to suppress because he alleged due process claims under the Federal and Iowa Constitutions, and the district court ruled on them. We agree with Booth-Harris that error was preserved.

Milde, *Bare Necessity: Simplifying the Standard for Admitting Showup Identifications*, 60 B.C. L. Rev. 1771, 1806, 1823 (2019) (stating "[t]he majority of state high courts apply the federal standard that the Supreme Court reiterated in [*Manson*]" and collecting cases that "follow the [*Manson*] test and apply the [*Neal v.*] *Biggers*[, 409 U.S. 188, 93 S. Ct. 375 (1972),] factors with little or no divergence"); Lawrence Rosenthal, *Eyewitness Identification and the Problematics of Blackstonian Reform of the Criminal Law*, 110 J. Crim. L. & Criminology 181, 205–06 & nn.132–133 (2020) [hereinafter Rosenthal, *Eyewitness Identification*] (identifying forty-one states and the District of Columbia that utilize the test articulated in *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243 (1977), and noting "[m]ost courts, when invited to depart from *Manson* as a matter of state law, have declined to do so"). "First, we decide whether the procedure used for the identification was impermissibly suggestive." *Taft*, 506 N.W.2d at 762. If we determine the procedure was impermissibly suggestive, we turn to the second step to decide whether "under the totality of [the] circumstances the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification." *Id.* (alteration in original) (quoting *State v. Whetstine*, 315 N.W.2d 758, 764 (Iowa 1982)).

Under the second step, the critical question is whether the out-of-court identification was reliable. *Id.* We have endorsed the prevailing five-factor test for assessing reliability of out-of-court identification procedures adopted from *Biggers*:

> (1) the opportunity of the witness to view the perpetrator at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the perpetrator, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Id.* at 763; *Manson,* 432 U.S. at 114, 97 S. Ct. at 2253; *Biggers,* 409 U.S. at 199–200, 93 S. Ct. at 382. "When unnecessarily suggestive pretrial out-of-court identification procedures conducive to mistaken identification that are incapable of repair are used, the Due Process Clause requires exclusion of the testimony of the identification." *State v. Folkerts,* 703 N.W.2d 761, 763 (Iowa 2005). There is no Due Process Clause violation as long as the identification has sufficient aspects of reliability. *State v. Webb,* 516 N.W.2d 824, 830 (Iowa 1994). If Booth-Harris cannot satisfy our two-part test, "the identification evidence and its shortcomings or credibility are for the jury to weigh." *Neal,* 353 N.W.2d at 87.

Booth-Harris urges us to modify our approach to eyewitness identification evidence given empirical research showing the accuracy and trustworthiness of eyewitness identifications are limited by estimator variables and system variables.[4] Booth-Harris asserts that the current test does not account for these variables and that some of the *Biggers* factors are at odds with the research. Booth-Harris asks us to incorporate these system and estimator variables when determining whether an identification is unduly suggestive and unreliable and to abandon the second step of our test. We decline to alter our test under the Iowa or Federal Due Process Clauses. The two-part test remains our law.

We acknowledge the evolving social science research without concluding that it serves as "a basis for establishing fixed principles of

---

[4]"Estimator variables" are the factors related to reliability that are "connected to the event, witness, or perpetrator—items over which the justice system has no control." *State v. Lujan,* 459 P.3d 992, 1001 (Utah 2020). Examples of estimator variables are the conditions such as lighting or distance that may have affected the witness's view, any stress or duress that the witness incurred, weapon focus, witness characteristics, perpetrator characteristics, and memory deterioration factors. *Id.* "System variables" are defined as "factors controlled by the court or law enforcement" such as the use of double-blind identification procedures, detailed instructions for the witness before conducting the identification procedure, and a proper lineup. *Id.*

constitutional law." *See State v. Lujan*, 459 P.3d at 992, 999 (Utah 2020).

This research has not persuaded the United States Supreme Court or the

overwhelming majority of other state supreme courts to alter or abandon

the two-part test. Our adherence to stare decisis is supported by the

recent decisions of the Utah and Wisconsin Supreme Courts that retreated

from their earlier decisions relying on the scientific research to alter the

test for admissibility of eyewitness identifications under state due process

provisions.

In *Lujan*, the Utah Supreme Court clarified an earlier opinion that

had expanded on the *Biggers* factors for the admissibility of eyewitness

identification testimony under the due process clause of the Utah

Constitution. *Id.* at 997–99 (discussing *State v. Ramirez*, 817 P.2d 774

(Utah 1991)). The unanimous *Lujan* court stated,

> The *Ramirez* opinion looked only to evolving social science in
> its articulation of the reliability factors that it identified. It
> based the factors on "well-respected and essentially
> unchallenged empirical studies" as laid out in *State v. Long*,
> 721 P.2d 483 (Utah 1986), even while conceding that the
> holding in *Long* "was not squarely based on the state
> constitution." The opinion established this "more empirically
> based approach" solely because the court "judge[d] this to be
> a more appropriate approach."
>
> These sorts of considerations—rooted in evolving social
> science and legal scholarship—may be appropriate grounds
> for our provision of "guidance" on the reliability of eyewitness
> identification testimony. But such evolving grounds are not a
> basis for establishing fixed principles of constitutional law.
> And our decision in *Ramirez* nowhere offered an originalist
> basis for constitutionalizing the reliability factors set forth in
> that opinion.

*Id.* at 999 (alteration in original) (citations omitted) (quoting *Ramirez*, 817

P.2d at 780). *Lujan* held the *Ramirez* factors could provide guidance under

the rules of evidence but could no longer serve as a constitutionally

required test for admissibility under the state due process clause. *Id.* at 999–1000. We agree.

We join the *Lujan* court in recognizing the development in the research and the use of estimator and system variables, but we echo that "research in this field is ongoing." *Id.* at 1001. As such, we agree with the Utah Supreme Court that other methods such as the evidentiary "rulemaking process lends itself nicely to adaptation over time in response to developments in scientific and legal scholarship in this important field." *Id.* at 995. "[A]s our understanding of the factors that affect the reliability of eyewitness testimony develops, our application and understanding of our rules of evidence can likewise evolve." *Id.* at 1001.

Similarly, in *State v. Roberson,* the Wisconsin Supreme Court rejected the defendant's argument that a victim's identification of the defendant should be suppressed because it began with law enforcement showing the victim a single Facebook photograph of the defendant. 935 N.W.2d 813, 815–16 (Wis. 2019). The Wisconsin Supreme Court expressly overruled its prior decision that departed from the United States Supreme Court decisions in *Manson* and *Biggers* and "was based on misunderstanding [those decisions] in regard to out-of-court identifications and on topical social science." *Id.* at 822. The *Roberson* court aptly held that given the tendency of scholars to embody the subjective beliefs of the time period, "social science research cannot be used to define the meaning of a constitutional provision." *Id.* at 820. We agree.

This is not to suggest that social science does not play a role in challenging the admissibility of eyewitness testimony under Iowa Rule of Evidence 5.403 or through expert testimony or modified jury instructions. The ISBA Jury Instruction Committee is welcome to evaluate revisions to

Iowa Uniform Jury Instruction 200.45. We anticipate that a new task force will evaluate revisions to the Iowa Rules of Evidence. Meanwhile, as always, defense counsel can cross-examine witnesses and argue the weight to be given their testimony. Counsel may also consider introducing expert testimony regarding the social science research. But we decline to defer to social science to raise our constitutional bar to admissibility. We trust Iowa juries to give the testimony appropriate weight.

1. *The photographic identification procedures were not impermissibly suggestive.* Turning to the first step in our analysis, we must determine whether the photographic identification procedures were impermissibly suggestive. "It must be conceded that even the most well-designed and well-applied pretrial identification procedure will be, to some extent, suggestive." *State v. Walton*, 424 N.W.2d 444, 447 (Iowa 1988).

The officers showed Watson a photo of Booth-Harris on three occasions. First, on the day of the shooting after Watson viewed the photographic array that included Polk's photograph and made no identification,[5] officers showed Watson a photo of Booth-Harris in a single-photographic display. Watson did not identify Booth-Harris at that time. Second, two days later, Watson was shown a photographic array that included Booth-Harris's photo when he stated he was fifty percent sure that Booth-Harris was the shooter but could not say so definitively given the way his eyes looked. Lastly, that same day, the officers showed Watson another photographic array that included a more recent photo of Booth-Harris, and Watson identified him as the shooter.

Booth-Harris contends the single-photographic display was impermissibly suggestive by making him stand out and appear familiar to

_____

[5]Booth-Harris's photo was not shown to Watson in the first photographic array on February 16, 2015, and he did not identify any of those individuals as the shooter.

Watson when Booth-Harris appeared again in the subsequent two photographic arrays. He claims it was unnecessary for the officers to show Watson his photograph in a single array given that there were no exigent circumstances and a photographic array could have been prepared and presented to Watson instead. Booth-Harris relies heavily on *State v. Lawson*, 291 P.3d 673 (Or. 2012) (en banc).

In *Lawson*, the Oregon Supreme Court outlined the existing research and eight system variables, or the best practices surrounding the eyewitness identification procedures. *Id.* at 686–87. First, the research recommends that the identification procedures be conducted by a "blind" administrator who does not know the identity of the suspect and therefore cannot purposely or unintentionally suggest that information to the witness. *Id.* at 686. Secondly, it recommends preidentification instructions that tell the witness that a suspect may or may not be in the lineup or photo array and that it is acceptable to not make an identification. *Id.* It notes that such an instruction significantly decreases the likelihood of misidentification. *Id.* Third, "lineup fillers should be selected first on the basis of their physical similarity with the witness's description of the perpetrator" and then based on their similarity to the suspect if there is no description. *Id.*

Fourth, the research favors a sequential showing of the photographs one at a time over a simultaneous viewing of the photos as a group because witnesses are more likely to make an absolute judgment rather than a relative judgment. *Id.* Fifth, the research states that showups, or procedures when the officer presents the witness with a single suspect for identification, are generally less reliable because the witness then knows who the police believe is a suspect. *Id.* However, the *Lawson* court noted that

> [w]hen conducted properly and within a limited time period immediately following an incident, a showup can be as reliable as a lineup. A showup is most likely to be reliable when it occurs immediately after the witness has observed a criminal perpetrator in action because the benefit of a fresh memory outweighs the inherent suggestiveness of the procedure.

*Id.* Sixth, the research warns that "[v]iewing a suspect multiple times throughout the course of an investigation can adversely affect the reliability of any identification that follows those viewings." *Id.* Seventh, *Lawson* identifies concerns with suggestive wording and leading questions. *Id.* at 687. And lastly, eighth, research warns that "[p]ost-identification confirming feedback tends to falsely inflate witnesses' confidence in the accuracy of their identifications, as well as their recollections concerning the quality of their opportunity to view a perpetrator and an event." *Id.*

Most of *Lawson*'s identified best practices for conducting eyewitness identification procedures were followed by the officers here. Sergeant McCune, who administered the second and third photograph arrays, was not involved in the criminal investigation and did not know who the suspect was. In each of those subsequent photographic arrays, Sergeant McCune read the photographic identification admonition form to Watson, and he signed it. The form reflects the best practice since it instructs the witness that the person who committed the crime may or may not be included in the photographic array, to "keep an open mind that the individuals may not appear exactly as they did on the date of the crime," and to take as much time as necessary to look at each photograph. The people used as "lineup fillers" were chosen by another detective because they looked the most similar to the suspect. For each array, the photographs were shown sequentially, one at a time. Watson quickly ruled out the five other photographs (in the first array), but paused on

photograph four, which was Booth-Harris. In the second array, Watson identified Booth-Harris again and stated the eyes were a closer match to the shooter's.

Although the officers showed Watson a single photograph of Booth-Harris, at that time, they did not consider him to be a suspect, and they did not know if he had a connection to the crime. Booth-Harris's photograph was not presented to Watson as a potential shooter; it was merely used to ask Watson if he knew who Booth-Harris was. This occurred on the same day as the crime. This single-photographic array is not sufficient to taint the identification procedure as impermissibly suggestive.

*Neal* is instructive. 353 N.W.2d 83 (Iowa 1984). In *Neal*, the victim had been abducted and sexually abused one evening but was able to escape her captor. *Id.* at 85. Shortly after the assault, and while the victim was in the hospital, the police showed her a set of photographs that did not include the defendant's picture. *Id.* at 87. She made no identification. *Id.* Six days later, the police showed her five mugshots, and "[a]lthough she would not make a positive identification, she did point out [the defendant] as most closely resembling her assailant." *Id.* Approximately two weeks later, a second array of four photos was prepared that contained a more recent photo of the defendant. *Id.* at 89. This time, the victim positively identified the defendant as her assailant. *Id.*

The defendant in *Neal* asserted that the second photo array was tainted by the fact that the victim had already been exposed to him through the image from the first photo array. *Id.* He claimed it was possible that she was identifying him based on the image from the first photo array rather than from the image of the person who assaulted her. *Id.* We held that the "defendant's first picture did not mislead the victim

into making the subsequent identification" because she did not make an identification during the first photo array and there were distinct differences between the images such that the second photo, which more closely resembled how the defendant looked around the time of the assault, portrayed a different hairstyle and a more mature individual. *Id.*

As in *Neal*, we do not find that the first photo misled Watson into making the subsequent identification. Watson did not initially identify Booth-Harris in the single photograph array, and he was careful not to select an individual whose facial features did not match his memory of the shooter. The photograph in the second array additionally showed a different angle and portion of Booth-Harris's face to reflect the portion of the shooter's face that Watson saw. Watson took care not to identify anyone until the facial features matched his memory of the shooter. *See State v. Rawlings*, 402 N.W.2d 406, 408 (Iowa 1987) (holding that the identification was not impermissibly suggestive despite the fact that the defendant was the only individual whose picture was repeated in the two arrays because "[a] reasonable effort to harmonize the lineup is normally all that is required"). Further, at trial, Watson stated that he had lied to the police about not knowing Booth-Harris when he was shown the single photograph array.

> Q. Well, isn't it a fact that you saw [Officer] Derek Schwandt at the police station on February 16th? A. I guess so.
>
> Q. Did you tell the truth to [Officer] Derek Schwandt about what happened that afternoon? A. No.
>
> Q. What did you not tell him the truth about? A. The picture lineup.
>
> Q. I'm sorry? A. The picture lineup.
>
> Q. What do you mean, the picture lineup? A. Like, when they was showing me the pictures and stuff like that, I lied about the person who it was.

> Q.  What lie did you tell?  A.  That I didn't know who it was.

The credibility of Watson's identifications was for the jury to decide.

Additionally, Booth-Harris contends the photographic identification procedures were impermissibly suggestive due to Watson's inflation of his level of certainty that Booth-Harris was the killer from seventy percent to one hundred percent after Sergeant McCune's prompting.  Even "[a]ssuming, without deciding, that the photographic identification procedure employed by the police here was 'suggestive,' it does not necessarily follow that the procedure was 'impermissibly' suggestive." *State v. Mark*, 286 N.W.2d 396, 404 (Iowa 1979).  We discourage officers from urging the witness to increase their level of certainty.  But we decline to find that Sergeant McCune's comments after Watson had identified Booth-Harris require exclusion of the identification.  Again, the jury could evaluate Watson's credibility in light of Sergeant McCune's postidentification comments.

The person that created the photo arrays, Detective Tripp, was not the same individual who showed the arrays to Watson, Sergeant McCune. In fact, Sergeant McCune was not involved in the investigation; did not know which of the photographs depicted the suspect; and, therefore, could not have signaled whether or not Watson correctly identified the suspect. As stated, Sergeant McCune's lack of involvement with, or knowledge of, the case was purposeful and in line with the best practices.  Since Sergeant McCune did not know whether or not Booth-Harris was the suspect, his potential encouragement that Watson increase his level of confidence in his identification was not impermissibly suggestive.  The availability of video evidence of their interaction further ensured the jury could make its

own determination on the reliability of Watson's level of certainty in his identification.

For the above reasons, we do not find that Watson's identification of Booth-Harris as the shooter was impermissibly suggestive.

2. *The photographic identification procedures were reliable.* To assess reliability under the second factor of our analysis, we turn to the five-factor *Biggers* test.

> (1) the opportunity of the witness to view the perpetrator at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the perpetrator, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Taft*, 506 N.W.2d at 763. Veering from the *Biggers* test, Booth-Harris contends that the identification was unreliable for a variety of reasons: Watson did not initially identify him in the single-photographic display, it was a high-stress situation, Watson could not see Booth-Harris's face or did not get a good look at him, weapon focus can affect reliability, Watson's certainty does not amount to reliability, there was a time delay between the incident and the identification, and Watson's drug use negatively impacted the accuracy of the identification.

As stated above, we reject Booth-Harris's invitation to abandon the *Biggers* factors. We will review each factor in turn. Watson had ample opportunity to view the shooter. Watson's attention was focused on the individual who he saw with a gun before he ran away when shots were fired. Watson acknowledged that his view of the shooter's face was from his nose to his forehead, and he particularly focused on the shooter's eyes. Watson's description of the shooter was largely accurate with the exception of his height estimate. Watson identified Booth-Harris as the shooter in two of the three arrays, and he indicated his level of certainty in the

identification each time. Additionally, Watson identified Booth-Harris's photograph and pointed out how the facial features matched that of the shooter whereas he quickly dismissed the other photographs in the array. Lastly, only two days passed between the incident and the positive identification. *See Mark*, 286 N.W.2d at 406 (holding that a timespan of one week between the incident and the identification was insufficient to defeat the reliability of the identification). Altogether, under the totality of the circumstances, the five factors weigh in favor of reliability.

We acknowledge that "[t]he reliability of eyewitness identification can be affected by a number of variables." *State v. Doolin*, ___ N.W.2d ___, ___ (Iowa 2020) (filed today). The additional factors that Booth-Harris argues should be considered when assessing reliability all go to the weight of Watson's identification, not admissibility. The fact that it was a high-stress situation and that Watson was under the influence of drugs is insufficient to exclude his identification. "Most evidence can be called into question in some way; however, that does not give the . . . court the ability to preclude admission. We have cross-examination for a reason; evidence often is tested in that way." *Roberson*, 935 N.W.2d at 828. The jury is responsible for weighing the evidence. As such,

> [w]e are content to rely upon the good sense and judgment of [our] juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Mark*, 286 N.W.2d at 405 (quoting *Manson*, 432 U.S. at 116, 97 S. Ct. at 2254). "The jury may be an imperfect vehicle for assessing eyewitness evidence, but it is the vehicle for resolving guilt or innocence found in the Constitution. We can have little confidence that a judge-made substitute

will do better." Rosenthal, *Eyewitness Identification*, 110 J. Crim. L. & Criminology at 243.

The *Roberson* court correctly noted that "not all showings of a single photo are infected by improper police influence causing a very substantial likelihood of misidentification. Each identification must be evaluated based on its own facts." 935 N.W.2d at 826. After applying the *Biggers* factors, the *Roberson* court determined that the single photographic array did not result in a substantial likelihood of misidentification and "the jury should decide whether [the defendant] was correctly identified." *Id.* at 827–28. Similarly, we do not believe that there is a substantial likelihood of irreparable misidentification under the totality of the circumstances here.

We conclude the photo array identification was not impermissibly suggestive and unreliable. Therefore, the district court did not err in denying Booth-Harris's motion to suppress Watson's photo array identification of him.

**B. Uniform Jury Instruction.**

We now turn to Booth-Harris's ineffective-assistance-of-counsel claim. The district court submitted Iowa's uniform instruction on eyewitness identification to the jury. *See* Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.45. Booth-Harris asserts on appeal that his trial counsel breached his duty by failing to request a more thorough eyewitness identification instruction that incorporated system and estimator variables and that he was prejudiced as a result. We disagree, and we determine that Booth-Harris's trial counsel did not provide constitutionally deficient representation by failing to request a different jury instruction.

To prevail on an ineffective-assistance-of-counsel claim, Booth-Harris must prove that his trial counsel (1) failed to perform an essential duty and (2) prejudice resulted. *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012) (describing the two-prong test for ineffective-assistance-of-counsel claims set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). We presume counsel performed competently unless the claimant proves otherwise by a preponderance of the evidence. *Id.* Counsel's performance is measured objectively against the prevailing professional norms after considering all the circumstances. *Id.*

"Trial counsel has no duty to raise an issue that lacks merit . . . ." *State v. Ortiz*, 905 N.W.2d 174, 184 (Iowa 2017); *see also State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003) (same). Counsel has a duty to be "familiar with the current state of the law." *State v. Hopkins*, 576 N.W.2d 374, 379–80 (Iowa 1998). But "[w]e do not expect counsel to anticipate changes in the law, and counsel will not be found ineffective for a lack of 'clairvoyance.'" *Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008). As such, "[i]n situations where the merit of a particular issue is not clear from Iowa law, the test 'is whether a normally competent attorney would have concluded that the question . . . was not worth raising.'" *Id.* (alteration in original) (quoting *Graves*, 668 N.W.2d at 881). The record must be adequate to enable us to resolve an ineffective-assistance-of-counsel claim on direct appeal. *State v. Ary*, 877 N.W.2d 686, 704 (Iowa 2016).

To establish the second prong of the test, prejudice, "the claimant must prove by a reasonable probability that, but for counsel's failure to perform an essential duty, the result of the proceeding would have been different." *Id.* at 705. This does not require a showing that counsel's conduct "more likely than not altered the outcome in the case," but rather that "the probability of a different result is 'sufficient to undermine [our]

confidence in the outcome' of the trial." *Id.* (alteration in original) (quoting *Graves*, 668 N.W.2d at 882).

We begin our analysis with the text of ISBA Criminal Jury Instruction 200.45, which states,

> The reliability of eyewitness identification has been raised as an issue. Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to see the person at the time of the crime and to make a reliable identification later.
>
> In evaluating the identification testimony of a witness, you should consider the following:
>
> 1. If the witness had an adequate opportunity to see the person at the time of the crime. You may consider such matters as the length of time the witness had to observe the person, the conditions at that time in terms of visibility and distance, and whether the witness had known or seen the person in the past.
>
> 2. If an identification was made after the crime, you shall consider whether it was the result of the witness's own recollection. You may consider the way in which the defendant was presented to the witness for identification, and the length of time that passed between the crime and the witness's next opportunity to see the defendant.
>
> 3. Any identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.
>
> 4. Any occasion in which the witness failed to identify the defendant or made an inconsistent identification.

Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.45 (2015). The instruction's comment notes that it is "provided for use when appropriate under *State v. Tobin*, 338 N.W.2d 879 (Iowa 1983)."

Booth-Harris contends that this model instruction is insufficient and that his counsel should have requested an alternative instruction or a modified model instruction that better informs the jury about system and estimator variables and educates them on memory recollection. He cites to other jurisdictions that have criticized the use of the federal

framework and instead encouraged and ultimately incorporated such enhanced instructions. *See Commonwealth v. Gomes*, 22 N.E.3d 897 (Mass. 2015); *Henderson*, 27 A.3d 872;[6] N.J. Criminal Model Jury Instructions, Identification: In-Court and Out-of-Court Identifications (2012), https://www.njcourts.gov/attorneys/criminalcharges.html.

However, despite the research relied upon by the Massachusetts and New Jersey courts, there is a growing body of academic literature that questions the efficacy of certain provisions in such jury instructions on eyewitness identifications. In fact, recent studies have shown that the more comprehensive jury instructions like New Jersey's *Henderson* instruction can actually overcorrect the problem. *See* Abigail Twenter, *Striking the Right Balance: Mitigating the Effects of Eyewitness Misidentification in Missouri*, 75 J. Mo. B. 14, 16 (2019) (noting the studies that support this theory). Results of a study that tested the efficacy of the instruction in a simulated murder trial with 335 mock jurors "indicated [that] the [*Henderson*] jury instruction was more likely to indiscriminately increase the rate of exonerations for *all* defendants, not just those who are innocent." *Id.* "Ideally, an instruction should help jurors discriminate good eyewitness testimony from bad," but studies that have tested the effect of the *Henderson* instruction have shown it does not accomplish this goal. Elizabeth F. Loftus, *Eyewitness Science and the Legal System*, 14 Ann. Rev. L. & Soc. Sci. 1, 6 (2018).

As one scholar noted, these studies, such as the one that found that

---

[6]A commentator recently observed that "*Henderson*'s protections may prove illusory." Rosenthal, *Eyewitness Identification*, 110 J. Crim. L. & Criminology at 201, 222–23. On remand, the *Henderson* trial court "conducted a hearing, made findings regarding each of the relevant systems and estimator variables, and then denied the motion to suppress [the witness's] identification." *Id.* at 201. The New Jersey intermediate appellate court upheld that ruling, and the New Jersey Supreme Court denied Henderson's petition seeking further review. *Id.*

> the reduction in the conviction rate occurred for both the strong and the weak case . . . suggest that scholars need to keep working to find new ways to improve the jury instructions so that they do not merely induce general skepticism but also improve sensitivity.

*Id.*; *see also* Nicholas A. Kahn-Fogel, *The Promises and Pitfalls of State Eyewitness Identification Reforms*, 104 Ky. L.J. 99, 119 (2015–2016) ("Yet there are reasons to believe that even the most detailed instructions might be insufficient to cause jurors to incorporate fully the results of scientific research into their decision-making. . . . [T]his research has not demonstrated superior outcomes with detailed instructions, and leading scientists have concluded that it remains an 'open question' whether detailed instructions can have a significant impact on juries."); Rosenthal, *Eyewitness Identification*, 110 J. Crim. L. & Criminology at 218 ("[S]tudies of the jury instructions utilized in New Jersey since the *Henderson* decision indicate that the new instructions cause mock jurors to become more skeptical of all eyewitness identifications, regardless of the strength of the evidence."); John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. Pub. Int. 10, 11–13 (2017) (casting doubt on part of New Jersey's *Henderson* instruction and similar instructions adopted by Massachusetts, Connecticut, and other states that suggest eyewitness confidence is generally an unreliable indicator of accuracy because research indicates those jury instructions fail to "appropriately communicate the high information value of an initial statement of confidence obtained from a pristine identification procedure"). Another scholar recently surveyed research studies, concluding the *Henderson* jury instructions are less effective than expected.

> Nor did we observe a significant impact on the verdict and non-verdict measures in interaction with case strength, indicating that *Henderson* instructions did not produce

sensitivity to eyewitness identification evidence. These findings are in contrast to the *Henderson* Court's assumption that the new researched-based case-specific instructions would help jurors to objectively evaluate eyewitness evidence. In fact, results indicate that *Henderson* instruction might not only fail to induce sensitivity but also might induce skepticism among jurors instead. These results are consistent with previous research findings ([Athan P.] Papailiou et al., [*The Novel New Jersey Eyewitness Instruction Induces Skepticism but Not Sensitivity*, PLoS ONE 10(12) (Dec. 2015)]; [Marlee Kind] Dillon et al., [Henderson *Instructions: Do They Enhance Evidence Evaluation?*, 17(1) J. of Forensic Psych. Res. & Prac. 1 (2017)]; [Angela M.] Jones et al., [*Comparing the Effectiveness of* Henderson *Instructions and Expert Testimony: Which Safeguard Improves Jurors' Evaluations of Eyewitness Evidence?*, 13 J. of Experimental Criminology 29 (2017)]; [Angela M.] Jones & [Steven D.] Penrod, [*Improving the Effectiveness of the Henderson Instruction Safeguard Against Unreliable Eyewitness Identification*, 24(2) Psych., Crime & L. 177 (2017)]). While the former two studies found that *Henderson* instructions led to an overall skepticism, the two latter studies found lack of any effect on the verdict. These studies also examined the effectiveness of *Henderson* instructions on different samples (undergraduates, community members), using different media (video, transcript), and types of crime (from robbery to murder) and different timing of the instructions (before or after eyewitness testimony), always with null findings. Altogether, the results suggest that *Henderson* instructions are not as effective as they were meant to be.

Radim Koníček, *Assessment of Eyewitness Testimony Accuracy: Effect of Different Type of Instructions on Delivering Guilty or Not Guilty Verdicts* 68 (April 27, 2018) (unpublished Master's thesis, Masaryk University) (on file with author). Another scholar more broadly observed:

> [T]he data are noisy, sometimes inconsistent, and provide nothing approaching a clear indication that reforms that reduce the risk of suggestion are likely to have a meaningful effect on the rate of false identifications—much less benefits that exceed their costs. The data are chaotic, and the state of our knowledge about eyewitness identification reform remains primitive.

Rosenthal, *Eyewitness Identification*, 110 J. Crim. L. & Criminology at 216.

Given the evolving research and debate in this area, trial counsel did not provide constitutionally deficient representation by failing to request

an alternative instruction or additions to the uniform instruction. When the researchers themselves are uncertain about the best practice for jury instructions, and when some recent research rejects utilizing the very type of instructions that Booth-Harris now desires, we cannot expect counsel to predict which side will prevail. Counsel did not breach his duty by failing to object to the ISBA Instruction 200.45, an instruction we have never held misstates the law.

We reiterate that "we are slow to disapprove of the uniform jury instructions." *State v. Ambrose*, 861 N.W.2d 550, 559 (Iowa 2015); *see also State v. Beets*, 528 N.W.2d 521, 523 (Iowa 1995) (per curiam) (same); *State v. Monk*, 514 N.W.2d 448, 450 (Iowa 1994) (en banc) (same); *State v. McMullin*, 421 N.W.2d 517, 518 (Iowa 1988) ("[W]e normally approve the submission of uniform instructions . . . ."); *State v. Weaver*, 405 N.W.2d 852, 855 (Iowa 1987) (same); *State v. Jeffries*, 313 N.W.2d 508, 509 (Iowa 1981) (same); *State v. Whiteside*, 272 N.W.2d 468, 471 (Iowa 1978) (same); *Ness v. H.M. Iltis Lumber Co.*, 256 Iowa 588, 594, 128 N.W.2d 237, 240 (1964) (same); *McMaster v. Hutchins*, 255 Iowa 39, 45, 120 N.W.2d 509, 512 (1963) (same). The uniform instructions are valuable to the bench and bar.

> "While we normally approve the submission of uniform instructions," we are free to find a "particular instruction is faulty." Everyone knows this. What some readers may fail to fully appreciate, however, is the tremendous service the members of the ISBA Jury Instruction Committee do for our justice system. Without the uniform instructions, trial judges and lawyers statewide would be burdened reinventing the wheel researching and drafting ad hoc jury instructions every trial. The variances in the wording of instructions would increase exponentially, further burdening appellate review. It is far better to have a committee of dedicated trial judges and lawyers craft uniform instructions to spare their colleagues that time and trouble. If an appellate court concludes a particular jury instruction is erroneous, or if our court changes the law in a manner requiring a revision, then corrections to the uniform instruction can be readily made

and implemented statewide.  The value of our current process is well understood by the bench and bar.

*Ambrose,* 861 N.W.2d at 563 (Waterman, J., concurring) (quoting *McMullin,* 421 N.W.2d at 518).

Of course, the ISBA Jury Instructions Committee is welcome to revisit Instruction 200.45 and recommend changes to the instruction for the ISBA Board of Governors to adopt or decline.  "[T]he court is not required to give any particular form of an instruction; rather, the court must merely give instructions that fairly state the law as applied to the facts of the case."  *State v. Marin,* 788 N.W.2d 833, 838 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.,* 880 N.W.2d 699, 708 & n.3 (Iowa 2016).  We hold that the ISBA Criminal Jury Instruction 200.45 does not misstate the law.

We hold that Booth-Harris's trial counsel had no duty to object to Instruction 200.45 or to request a different instruction on eyewitness identifications.  Because Booth-Harris failed to prove the first element required to prevail on an ineffective-assistance-of-counsel claim, a breach of duty, we end our analysis there.  *See Graves,* 668 N.W.2d at 869 ("A defendant's inability to prove either element is fatal.").

**IV.  Disposition.**

For the foregoing reasons, we affirm the court of appeals decision in part and vacate in part.  We affirm the district court's judgment of conviction and denial of the motion to suppress.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel, J., who dissents.

#18–0002, *State v. Booth-Harris*

**APPEL, Justice (dissenting).**

The comfortable conventional canard is this: "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 2254 (1977). From the beginning, this proposition was doubtful, but we now know after decades of scientific evidence that the opposite is true. Studies have shown that our wonderfully honest jurors often hold intuitive views about the accuracy of eyewitness testimony that are simply incorrect. Cindy Laub & Brian H. Bornstein, *Juries and Eyewitnesses, in Encyclopedia of Psychology and Law* 390, 390–92 (Brian L. Cutler ed., 2008); *see* Jules Epstein, *Irreparable Misidentifications and Reliability: Reassessing the Threshold for Admissibility of Eyewitness Identification*, 58 Vill. L. Rev. 69, 90 (2013) [hereinafter Epstein, *Irreparable Misidentification*] (citing a 2011 study surveying over 1800 people in the United States that showed that 63% agreed the memory works like a video camera where we can review and inspect the event later and 47.6% agreed that once experiencing an event and a memory is formed it does not change). The jurors need our help.

In fact, because it is one of the most powerful pieces of evidence that can be presented to a jury, eyewitness testimony is the leading cause of wrongful convictions. Richard A. Wise et al., *How to Analyze the Accuracy of Eyewitness Testimony in a Criminal Case*, 42 Conn. L. Rev. 435, 441 (2009) [hereinafter Wise et al., *Criminal Eyewitness Testimony*]. With the significant role eyewitness testimony plays in our criminal justice system, we must adapt our legal system to our scientific understanding in order to

ensure that convictions are not being obtained based on eyewitness misidentifications.

Our system of justice currently tolerates an unacceptably high risk of misidentification. The due process standard developed decades ago by the United States Supreme Court under the United States Constitution, and uncritically applied by this court under the Iowa Constitution, requires only a "modicum of potential reliability" for admission of eyewitness identification. Epstein, *Irreparable Misidentification*, 58 Vill. L. Rev. at 71. As a corollary to the very low standard of admissibility, we endorse the convenient and self-satisfying illusion that the adversarial system and cross-examination provide jurors with the kind of information needed to intelligently weigh the evidence in a fashion sufficient to afford a defendant a fair trial.

But we now know better. For reasons beyond my comprehension, the eyewitness science is not harnessed by the majority. But our system today utilizes what amounts to stone-aged principles. The declaration that "this is how it has always been done" is inadequate. As the great Oliver Wendell Holmes observed,

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since and the rule simply persists from blind imitation of the past.

Oliver Wendell Holmes, *The Path of the Law*, address dedicating a new hall at Boston University School of Law (January 8, 1897), *in* 10 Harv. L. Rev. 457, 469 (1897), as quoted in *Varnum v. Brien*, 763 N.W.2d 862, 877 (Iowa 2009).

Further, our criminal justice system should not be a conveyor belt designed efficiently to produce convictions, affirmed on appeal, in

sufficient number to meet the perceived demands of law and order. A court system that singularly focuses on achieving convictions bends toward a brand of state authoritarianism that should not be acceptable in a democratic society.

Instead, we must zealously pursue with grit and determination *twin* goals: that the guilty are convicted and the innocent go free. *See Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935). In order to achieve these twin goals, it is imperative that we fashion our legal rules to conform to our developing scientific knowledge on the critically important question of eyewitness identification. That is what I have tried to do in *Doolin* and in this opinion.

If we applied a legal structure that is consistent with and based upon what we know about eyewitness identification, the conviction in this case would be reversed. I therefore respectfully dissent.

## I. Introduction.

There is no need here to repeat the extensive overview of the evolution of eyewitness testimony science given in *State v. Doolin*, ___ N.W.2d ___ (Iowa 2020) (Appel, J., dissenting), which I incorporate by reference. There is, however, a body of science that relates directly to the deficiencies presented in the identification of Earl Booth-Harris that did not receive extended treatment in *Doolin*. First, I review that eyewitness science below.

Second, I review the facts of the eyewitness identification in this case. As will be seen, from the very beginning there were important estimator and system variables that significantly decreased the overall reliability of the identification later made by Donnell Watson. Further, the identification process in this case was unnecessarily suggestive in several respects. In short, the identification was highly unreliable.

Third, I examine the principles of due process under the United States and Iowa Constitutions. I discuss how the Iowa Constitution can provide greater protections for Iowans when facing possible eyewitness testimony. Under the Iowa Constitution, we can incorporate widely accepted scientific knowledge and utilize those developments to create a system that advances the goal of a fundamentally fair criminal justice system even if the United States Supreme Court declines to do so under the United States Constitution. I conclude that fundamental fairness, in light of the science, requires a new due process approach to the admission of evidence of eyewitness identification.

Finally, I discuss whether defense counsel was ineffective in not requesting a science-based eyewitness identification instruction to aid the jury in this case. The Iowa State Bar Association (ISBA) instruction on eyewitness identification, based on a case from the 1970s, has not been modified to reflect the over forty years of research in the areas of cognition, recall, and perception. The ISBA eyewitness identification jury instruction became obsolete about twenty years ago.

The time for a change in the instruction has not simply arrived: it has long since passed. A competent criminal attorney who has followed the development of the law would know that and should have requested an appropriate modern eyewitness identification instruction that can be found in the caselaw and scholarly literature. I conclude that the failure to seek a science-based eyewitness identification instruction amounted to ineffective assistance of counsel.

**II. Variables & the Identification.**

**A. Eyewitnesses, Juries, and the Science.**

1. *Introduction.* As noted in the *Doolin* dissent, many states, though not yet Iowa, have started to embrace the vast and extensive knowledge of

eyewitness science in their judicial system. *See, e.g., Young v. State,* 374 P.3d 395, 417–26 (Alaska 2016); *State v. Guilbert,* 49 A.3d 705, 720–25 (Conn. 2012); *Brodes v. State,* 614 S.E.2d 766, 770–71 (Ga. 2005); *State v. Cabagbag,* 277 P.3d 1027, 1034–39 (Haw. 2012); *Commonwealth v. Gomes,* 22 N.E.3d 897, 907–17 (Mass. 2015); *State v. Henderson,* 27 A.3d 872, 896–913 (N.J. 2011); *State v. Lawson,* 291 P.3d 673, 685–88 (Or. 2012) (en banc); *State v. Long,* 721 P.2d 483, 488–91 (Utah 1986).[7]

It is virtually undisputed that over the past four decades, "serious concerns have been raised about the potential unreliability of eyewitness identification evidence." Gary L. Wells et al., *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence,* 44 Law & Hum. Behav. 3, 4 (2020) [hereinafter Wells et al., *Policy & Procedures*]. When it comes to eyewitness identifications, an "[a]ccurate eyewitness identification requires that a witness to a crime correctly sense, perceive, and remember objects and events that occurred and recall them later." Nat'l Acad. of Scis.,[8] *Identifying the Culprit: Assessing Eyewitness Identification*[9] 45 (2014) [hereinafter Nat'l Acad. of Scis., *Identifying the Culprit*]. Accordingly, the accuracy of the witness's identification depends on the limits of the witness's "sensation, perception, and memory." *Id.* Current research provides greater and more thorough insight into how these systems can

---

[7]For more states and cases embracing scientific research when evaluating eyewitness testimony see *Doolin,* ___ N.W.2d at ___ n.1.

[8]The National Academy of Sciences is a private, nonprofit society, established by an Act of Congress in 1863 charged with providing "independent, objective advice to the nation on matters related to science and technology" and "committed to furthering science in America." *Mission,* Nat'l Acad. of Scis., http://www.nasonline.org/about-nas/mission/ [https://perma.cc/WK7W-K36D].

[9]In preparing the report, the committee heard from numerous experts, practitioners, and stakeholders and reviewed relevant, published and unpublished, works in the relevant scientific arena. Nat'l Acad. of Scis., *Identifying the Culprit* at 2.

misdirect, misperceive, and fail the witness. In addition to the science outlined in the *Doolin* dissent, there are several other points of scientific consensus that have a bearing in the case before us.

2. *Perception, memory, and noise.* Both vision and memory are contaminated by noise—factors that lead to uncertainty by the observer about whether a particular signal is present. *Id.* at 47. In vision, noise can be in the form of lighting, glares, shadows, obstructions, loud or distracting sounds, and other sources relevant and not relevant to the sensory content. *Id.*

Specific to vision, when a person views an object, person, or event, a complex process in the form of light refraction, photoreceptors, and sensory processing occur. *Id.* at 50 (outlining the process and research). While some factors are inherent to the visual system of the perceiver, others are dependent upon the viewing conditions, such as time of exposure and lighting. Both work together to influence the quality and accuracy of the information gained by the observer. *Id.* at 50–51. Even further, the National Academy of Sciences asserted that under the typical viewing conditions associated with a typical crime, "[the] source of noise may place severe limitations on the ability of the observer to sense key pieces of information that are not present at the center of gaze." *Id.* at 51.

Similar to vision, memory is susceptible to noise. Encoding memory, storing memory, and remembering does not occur in a vacuum, unaffected by the outside environment. *Id.* at 59–60. Instead, the fidelity of our memories face compromise at various stages in the process. "Without awareness, we regularly encode events in a biased manner and subsequently forget, reconstruct, update, and distort the things we believe to be true." *Id.* at 60. As such, the memory of an eyewitness is malleable and requires care in testing. Brandon L. Garrett, *Eyewitness*

*Identifications and Police Practices: A Virginia Case Study*, 2 Va. J. Crim. L. 1, 3 (2014).

3. *Estimator variables.* Factors independent of the criminal justice system are referred to estimator variables and empirical studies explain that a wide range of those variables may have a significant effect on eyewitness accuracy. Clifford S. Fishman & Anne T. McKenna, 7 *Jones on Evidence* § 61:10 (7th ed.), Westlaw (database updated July 2019). Estimator variables are for augmenting or discounting the credibility of witnesses. Gary L. Wells, *Applied Eyewitness-Testimony Research: System Variables and Estimator Variables*, 36 J. Personality & Soc. Psychol. 1546, 1546 (1978). I turn to the estimator variables most pertinent to the Booth-Harris identification, focusing on those impacting vision and memory, and how they discount the credibility of the eyewitness.

a. *Perpetrator characteristics—disguise, familiarity, and own-race bias.* Disguises negatively impact identification accuracy. Jamal K. Mansour et al., *Impact of Disguise on Identification Decisions and Confidence with Simultaneous and Sequential Lineups*, 36 Law & Hum. Behav. 513, 513–14 (2012) [hereinafter Mansour et al., *Disguise and Identification*] (discussing the various ways disguises can impact identification, such as imparting less identifying information, highlighting that disguises influence attention allocation by the witness and can decrease the amount of information able to be encoded). The Mansour study supported the postulation that the more disguised the target's face was the less likely a study participant was to make an accurate lineup decision. *Id.* at 523. Additionally, the likelihood of erroneous identification depended not only on the degree of disguise but also on what parts of the face are disguised. *Id.* at 523–24. Disguises function as a type of noise

influencing a witness's ability to fully take in and process information. *See* Nat'l Acad. of Scis., *Identifying the Culprit* at 69.

Adding to the complexity of identifications, depending on the observer's familiarity with the face, their ability to recognize the person varies. Angus F. Chapman et al., *How Robust Is Familiar Face Recognition? A Repeat Detection Study of More Than 1000 Faces*, Royal Soc'y Open Sci., 2, 10 (2018), https://royalsocietypublishing.org/doi/pdf/10.1098/rsos.170634; Nat'l Acad. of Scis., *Identifying the Culprit* at 68. In fact, people are "remarkably poor" at matching unfamiliar faces. Ahmed M. Megreya & A. Mike Burton, *Unfamiliar Faces Are Not Faces: Evidence from a Matching Task*, 34 Memory & Cognition 865, 865 (2006). In *Wade*, the Supreme Court cautioned that the identification of a stranger is "proverbially untrustworthy." *United States v. Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 1933 (1967).

Cross-race identification—identification of individuals outside of one's own racial group—is consistently worse than own-race identification. Michael P. Seng & William K. Carroll, *Eyewitness Testimony: Strategies and Tactics* § 2:23 (2d ed.), Westlaw (database updated Nov. 2019); Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 Psychol., Pub. Pol'y, & L. 3, 3 (2001) (reviewing results of thirty years of research on own-race bias in the memory of faces); Andrew E. Taslitz, *"Curing" Own Race Bias: What Cognitive Science and the* Henderson *Case Teach About Improving Jurors' Ability to Identify Race-Tainted Eyewitness Error*, 16 N.Y.U. J. Legis. & Pub. Pol'y 1049, 1052 & n.18 (2013) (discussing the extensive research regarding "own race bias" and how the effect results in eyewitnesses of one race being more likely to misidentify innocent persons when the innocent person is of another race).

b. *Duration of exposure.* Longer exposure duration—time available to view the perpetrator—is generally associated with a witness's ability to subsequently identify the perpetrator. Gary L. Wells et al., *Eyewitness Evidence: Improving Its Probative Value*, 7 Psychol. Sci. Pub. Int. 45, 53–54 (2006) [hereinafter Wells et al., *Eyewitness Evidence*]. Legally, exposure duration has long been thought of as a factor to be considered when evaluating eyewitness testimony.[10] Research confirms exposure's significance, finding "relatively long exposure duration produces greater accuracy." Nat'l Acad. of Scis., *Identifying the Culprit* at 97–98. Exposure may interact with, and affect, other variables as well.

c. *Stress and attention.* The face of the perpetrator following a traumatic event is often said to be "burned into someone's memory" or in making an identification, someone may claim that they'll "never forget" the face. Contrary to the popular belief that stress heightens one's ability to perceive and memorize, research actually suggests the opposite. Elizabeth F. Loftus, *Ten Years in the Life of an Expert Witness*, 10 Law & Hum. Behav. 241, 254–55 (1986) [hereinafter Loftus, *Ten Years*]. Instead, high stress or fear can affect eyewitness identification impacting both vision and memory. Nat'l Acad. of Scis., *Identifying the Culprit* at 94; Loftus, *Ten Years*, 10 Law & Hum. Behav. at 254–55 (explaining the Yerkes-Dodson Law as a theoretical relationship between stress and memory finding low stress and high stress impair attention); Wise et al., *Criminal Eyewitness Testimony* 42 Conn. L. Rev. at 456, 505–06; Wells et al., *Eyewitness*

---

[10]*See Manson*, 432 U.S. at 108, 97 S. Ct. at 2250 (considering eyewitness testimony that focused on the distance between the officer and seller, the duration of the interaction, and lighting, ultimately noting that the officer "certainly was paying attention to [the] identity [of] the seller"); *Neil v. Biggers*, 409 U.S. 188, 200, 93 S. Ct. 375, 382 (1972) (when considering the eyewitness identification the court considered the "considerable period of time" the victim spent with her assailant and the lighting conditions under each observation).

*Evidence*, 7 Psychol. Sci. Pub. Int. at 52–53 (discussing a 2004 study on active duty military personnel who experienced high-stress interrogations with real physical confrontation and low-stress interrogations without physical confrontation and concluding the low-stress interrogations produced more accurate results).

Another commonly held belief is that in stressful situations, experiences become more vivid. In highly stressful conditions, vision and memory can be affected, resulting in significant impairments in reporting key characteristics of a face. Nat'l Acad. of Scis., *Identifying the Culprit* at 94. In stressful situations, an observer is faced with the choice to "select" what they are to pay attention to, and they must do so in a short window of time and without advance warning. *Id.* at 53. The noise surrounding the environment creates competing interest that can hijack attentional focus. *Id.* at 54. Attentional hijacking is particularly relevant when encountering stimuli that provoke a strong emotional response, such as fear and arousal. *Id.* at 55. Further, visual stimuli may trigger fear and command attention, as is the case with a weapon. *Id.*

When a person is aware that they are perceiving a significant event, their attention is more focused, perception and their memory of the event is improved. Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2 Fed. Cts. L. Rev. 1, 10 (2007) [hereinafter Fradella, *Expert Eyewitness Testimony*]. Along with significance, violence also impacts attention to the event. *Id.* ("Even when witnesses understand that they are watching a significant event, 'the more violent the act, the lower the accuracy and completeness of perception and memory.' This is a function of the negative impact that high levels of arousal and stress can produce." (quoting Frederick Emerson Chemay, *Unreliable Eyewitness Evidence: The Expert Psychologist and the*

*Defense in Criminal Cases*, 42 La. L. Rev. 721, 728 (1985))). Discussing the Yerkes-Dodson Law, Fradella noted, "When people are concerned about personal safety, they tend to focus their attention on the details that most directly affect their safety, such as 'blood, masks, weapons, and aggressive actions.'" *Id.* at 12 (quoting Curt R. Bartol & Anne M. Bartol, *Psychology and Law* 221 (2d ed. 1994)). In drawing their attention towards what may cause harm, they focus less on details of the crime scene.

Research has shown that the presence of a weapon during a crime captures the attention of witnesses and impedes their ability to attend to other aspects of the event, such as the face of the perpetrator. Ani A. Aharonian & Brian H. Bornstein, *Stress and Eyewitness Memory*, *in* 2 *Encyclopedia of Psychology and Law* 770 (Brian L. Cutler ed., 2008) [hereinafter Aharonian & Bornstein, *Stress and Eyewitness Memory*] ("Stress effects can also be complicated by the presence of a particularly arousing, eye-catching aspect of the event, such as gore or a weapon."); Nat'l Acad. of Scis., *Identifying the Culprit* at 93; Fradella, *Expert Eyewitness Testimony*, 2 Fed. Cts. L. Rev. at 12 ("The so-called weapons effect describes crime situations in which a weapon is used, and witnesses spend more time and psychic energy focusing on the weapon rather than on other aspects of the event."); Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 Law & Hum. Behav. 1, 11 (2009) [hereinafter Wells & Quinlivan, *Suggestive Eyewitness ID*] ("Eyewitness experiments have consistently shown that the presence of a weapon . . . leads to a reduced ability to recognize the face of the culprit later."). While recognizing research's limitations[11] in how

---

[11]Researchers are ethically limited to the amount of experimental stress that can be induced in a subject. Even with highly arousing materials, participants in these

stress, arousal, and recall influence one another, it does not mean that we must be silent on what we do know. "[I]t is clear that, overall, high levels of stress harm eyewitness memory in more ways than they help it." Aharonian & Bornstein, *Stress and Eyewitness Memory* at 770.

d. *Witness characteristics and condition.* An eyewitness's ability to perceive and remember may be impacted by characteristics and conditions of the witness themselves. Personal characteristics include intoxication, injury, illness, age, and fatigue. *Lawson*, 291 P.3d at 687; Wells et al., *Eyewitness Evidence*, 7 Psychol. Sci. Pub. Int. at 54 (discussing how intoxication has been shown to correlate with lower rates of correct identification and how "alcohol myopia" results in less accuracy on target-absent conditions). Research studying recall and cognition demonstrate that cannabis intoxication affects memory. Annelies Vredeveldt et al., *Effect of Cannabis on Eyewitness Memory: A Field Study*, 32 Applied Cognitive Psychol. 420, 420 (2018) (discussing their study and findings of cannabis use on identification, recall, and confidence). From the studies, it appears that the effect of cannabis occurs in all stages of memory, however, more research is needed to determine what stage of memory cannabis intoxication affects the most. *Id.* at 421.

e. *Memory decay and contamination.* Memory retrieval is the "process by which stored information is accessed and brought into consciousness, where it can be used to make decisions and guide actions." Nat'l Acad. of Scis., *Identifying the Culprit* at 65. It is a complex and

---

studies are usually not personally threatened, they are bystanders rather than victims or potential victims. These limitations likely influence stress, behavior, degree of attention, and other factors that a victim of crime must undergo and process. Aharonian & Bornstein, *Stress and Eyewitness Memory* at 770; *see also* Nat'l Acad. of Scis., *Identifying the Culprit* at 94 (speaking about weapon effect and recognizing that it may not be possible to sufficiently test the effects of stress and heightened stress in a laboratory setting due to limitations on participants).

dynamic system of encoding,[12] storing,[13] and remembering.[14]  *Id.* at 59–60.  Memory declines over time, and once a memory is formed, it starts to decay.  *See* Nat'l Acad. of Scis., *Identifying the Culprit* at 60–61; Fradella, *Expert Eyewitness Testimony*, 2 Fed. Cts. L. Rev. at 10; Gary L. Wells, *Applied Eyewitness-Testimony Research: System Variables and Estimator Variables*, 36 J. Personality & Soc. Psychol. 1546, 1552 (1978).  The falsity of stable and reliable memory was addressed in 1977 by Justice Marshall. *Manson*, 432 U.S. at 131, 97 S. Ct. at 2261 (Marshall, J., dissenting) ("[T]he fact is that the greatest memory loss occurs within hours after an event. After that, the drop off continues much more slowly.").  Today, more than forty years later, we know even more.

Memory can be compromised at any stage in the process.  Nat'l Acad. of Scis., *Identifying the Culprit* at 60.  Furthermore, quality may be affected. Once compromised, information may "never be consolidated fully" to long-term memory when exposure occurs under highly emotional conditions or with highly emotional content.  *Id.* at 61.

Once memories are stored, there is still a possibility of modification. *Id.* at 62 ("We forget, qualify, or distort existing memories as we acquire new perceptual experiences and encode new content and associations into memory.").  Again, the emotional nature of the event factors into the storage process.  *Id.* at 63–64 (noting that highly arousing emotional stimuli, which tends to be more lasting than memories that are nonarousal

---

[12]"[E]ncoding refers to the process whereby perceived objects and events are initially placed into storage."  Nat'l Acad. of Scis., *Identifying the Culprit* at 60.

[13]"[S]torage refers to long-term retention of the information after encoding."  Nat'l Acad. of Scis., *Identifying the Culprit* at 62.

[14]Remembering refers to retrieval by which the encoded and stored information is brought into consciousness and is used for decision-making.  Nat'l Acad. of Scis., *Identifying the Culprit* at 65.

in stimuli, are more vivid, but are just as prone to errors and are held in higher confidence).

Because of this complex system, reliability is higher when the identification is made within hours after the crime, and with any delay in time after that, reliability decreases. Wells & Quinlivan, *Suggestive Eyewitness ID*, 33 Law & Hum. Behav. at 13 (explaining how with the passage of time frames measured in minutes, hours, or days, more memory loss occurs—described as the "forgetting curve"); *see also* Wise et al., *Criminal Eyewitness Testimony*, 42 Conn. L. Rev. at 505 & n.340 (discussing the forgetting curve and retention interval).

4. *System variables.* The definition of system variables has broadened over time to include "factors under the control of the justice system that *relate to* (as opposed to *influence*) the accuracy of eyewitness identifications. Wells et al., *Policy & Procedures*, 44 Law & Hum. Behav. at 6. System variables were discussed in great length in *Doolin*, ___ N.W.2d at ____. Only the system variables of concern here will be discussed.[15]

---

[15]Preidentification instructions and blind administration will not be discussed. During the Booth-Harris identification, Watson was read the photographic admonition before each photo array was presented. The admonition stated,

> You are about to view a photographic line-up. The person who committed the crime may or may not be included in it. While looking at the photographs, keep an open mind that the individuals may not appear exactly as they did on the date of the crime. Their hairstyles, facial hair, clothing etc. may have changed. Also, photographs may not always depict the true complexion of a person, who may be lighter or darker than shown in the photo. The officer showing you the photographs has no knowledge of the incident. In the line-up process, the photograph will be shown to you one at a time and are not in any specific order. Take as much time as you need to look at each photograph. Even if you identify an individual the officer will continue to show you each photograph. The officer is not allowed to tell you whether your choice, if you make one, is a suspect in the investigation. Do not tell other witnesses that you have or have not identified anyone.

Also, the two arrays were conducted under a double-blind administration since the administrator was not involved in the investigation and did not know the identity of the

a. *Lineup construction.* There is significant research and writing on the proper construction of a lineup or photo array. Guidance has been provided by the Department of Justice (DOJ), local police departments, and scientific research generally. The most common police-arranged tool for identification is the photo array. Nat'l Acad. of Scis., *Identifying the Culprit* at 23. Importantly, the suspect must not stand out from the fillers in the array. Third Circuit Task Force, *2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 Temp. L. Rev. 1, 35 (2019) [hereinafter Third Circuit Task Force, *2019 Report*]; Memorandum from Sally Q. Yates, Deputy Att'y Gen., Dep't of Justice, to Heads of Dep't Law Enf't Components, All Dep't Prosecutors (Jan. 6, 2017) [hereinafter Yates Memo], https:// www.justice.gov/archives/opa/press-release/file/923201/download) (on *Eyewitness Identification: Procedures for Conducting Photo Arrays*, Procedures 3.2,[16] 3.3.[17]

---

suspect. *See Doolin*, ___ N.W.2d at ___ (further discussing preidentification instructions and blind administration along with cited sources).

[16]Fillers should generally fit the witness's description of the perpetrator, including such characteristics as gender, race, skin color, facial hair, age, and distinctive physical features. They should be sufficiently similar so that a suspect's photograph does not stand out, but not so similar that a person who knew the suspect would find it difficult to distinguish him or her. When viewed as a whole, the array should not point to or suggest the suspect to the witness.

[17]Where the suspect has a unique feature, such as a scar, tattoo, or mole, or distinctive clothing that would make him or her stand out in a photo array, filler photographs should include that unique feature either by selecting fillers who have such a feature themselves or by altering the photographs of fillers to the extent necessary to achieve a consistent appearance. If the suspect's distinctive feature cannot be readily duplicated on the filler photographs, then the suspect's feature can be blacked out and a similar black mark can be placed on the filler photographs. The administrator should document any alterations to either the fillers or the suspect's photograph as well as the reason(s) for doing so.

b. *Showups.*[18] A showup occurs when a single suspect is shown to a witness, typically live, and soon following the crime. In the scientific community, showups, by their nature, are generally regarded as suggestive. Third Circuit Task Force, *2019 Report*, 92 Temp. L. Rev. at 41. As the Supreme Court declared over fifty years ago, "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police." *Wade*, 388 U.S. at 234, 87 S. Ct. at 1936; *accord Doolin*, ___ N.W.2d at ___. When a witness is shown a single photograph, there is an increased danger of error in identifying a person. *See State v. Mark*, 286 N.W.2d 396, 404 (Iowa 1979). *See generally* Amy Luria, *Showup Identifications: A Comprehensive Overview of the Problems and a Discussion of Necessary Changes*, 86 Neb. L. Rev. 515 (2008).

c. *Repeated exposure.* Research supports that repeated viewings of a suspect are risky due to mugshot exposure, unconscious transference, and source confusion. Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 Law & Hum. Behav. 287, 287–88 (2006). Repeated exposure through a mugshot book, showup, or lineup, increases the chance of being identified in a later identification even if an initial identification did not occur in the first identification procedure. Wells et al., *Policy & Procedures*, 44 Law & Hum. Behav. at 25 (citing studies supporting the finding); *see also* Brandon L. Garrett, *Eyewitnesses and Exclusion*, 65 Vand. L. Rev. 451, 470 (2012) [hereinafter Garrett, *Exclusion*].

---

[18]*See Doolin*, ____ N.W.2d at ___ (discussing showups and related research).

d. *Feedback to witness.* Outside information presented to the witness can contaminate an identification. The DOJ issued guidance on eyewitness identifications and suggests avoiding "words, sounds, expressions, actions[,] or behaviors" suggesting who the suspect is. Yates Memo, Procedure 8.1, at 5. Should an identification be made, the administrator should ask for a confidence statement. *Id.* Procedure 8.2, at 5. If the witness provides a "vague" answer, the administrator should ask for the witness to provide clarification. *Id.* Procedure 8.3, at 5. Investigator or administrator feedback may result in the witness being more inclined to make an identification or may inflate the witness's confidence in their selection. *Id.* at 8.

e. *Level of confidence.*[19] With the broadening of the definition of system variables, confidence statements may now fall under system variables because of their ability to be easily contaminated by events that are under the control of system actors. Wells et al., *Policy & Procedure*, 44 Law & Hum. Behav. at 6. Under pristine identification procedures,[20] the confidence that a witness expresses is usually a "highly reliable indicator of accuracy." John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. Pub. Int. 10, 11 (2017). Confidence correlates to pristine conditions, when the memory is first tested, and before contamination occurs. *Id.* at 13.

---

[19]*See Doolin*, ____ N.W.2d at ___ (regarding witness confidence and corresponding research).

[20]The pristine lineup conditions identified were (1) including only one suspect per lineup, (2) including a suspect that does not stand out in the lineup, (3) cautioning that the suspect might not be in the lineup, (4) using double-blind testing, and (5) collecting a confidence statement at the time of the identification. John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. Pub. Int. 10, 20 (2017).

I now turn now to the facts of the case and apply these factors.

## B. The Flawed Identification.

1. *The limited opportunity to identify the shooter at the scene.* During his interview at the scene with Officer Fogle, Watson stated that he, his cousin Deonte Carter, and Carter's friend, Edward DeWitt, were talking at the park when they noticed a large group of black males standing on the corner of 8th and Elm. Except for Terrance Polk, Watson stated he did not recognize any of the males in the other group.

The group of men continued to talk when "the next thing he knew," a black male approached them. Watson provided a very detailed description of the clothing the male was wearing. Watson reported the male was wearing a "dark colored windbreaker and a black hoodie underneath with the hoodie pulled up, wearing blue jeans, brown boots, and a black skull cap pulled over his forehead where [*Watson*] *couldn't see his face.*" He did however notice something at the man's side: a gun. After a brief exchange of words between the male and Carter, the male raised the gun from his side, hesitated, and put it back down. Carter then said to the man, "do what you're gonna do," and following those words, shooting began.

Watson stated that once the shooting started he took off running and only returned after the shooting ended. He returned to a traumatic and chaotic scene, with his cousin bleeding on the ground, and called 911.

Watson was interviewed at the scene by the officers. While he was not able to provide much of a physical description of the shooter, outside of clothing, he could provide a description of the gun, a silver-colored gun believed to be .40 or .45 caliber.[21] Watson was escorted to the police

---

[21]When asked about how he estimated the caliber, Watson stated his estimation was based on the shell casings surrounding the scene.

station for further interviewing. In Officer Fogle's report it is noted that he asked Watson "several times" if he knew the shooter and Watson stated he did not.

Watson was able to provide a final description to Detective Schwandt, stating the shooter was a black male, about 5'11", 150 pounds, twenty-one to twenty-two years old, and with a light beard. He provided more information about the clothing the shooter was wearing, adding the shooter was wearing a black hat with yellow letters. Also at this time, Watson admitted to smoking marijuana before arriving at the park. The detective could still smell the marijuana emanating from his person.

Watson was shown a photo array soon after the shooting, and he did not pick anyone out as the shooter.[22] Watson was then shown a stand-alone picture of Booth-Harris.[23] He did not indicate that he knew Booth-Harris, and he did not identify him as the shooter. So even when provided with a one person showup, relatively shortly after the shooting, Watson could not make the identification.

Based upon the events that unfolded, it is clear that there were troublesome estimator variables that potentially impacted his perception and memory of the event. The shooter was well disguised in that Watson stated he could not see his face. It is difficult to make a solid identification when one cannot see the perpetrator's face. Further, the shooter had a weapon and pointed it once or twice during the short interaction, thus

---

[22] The police initially thought Polk was the shooter and had a picture of Polk in the first array shown to Watson. Watson did not identify Polk as the shooter.

[23] When asked why he presented the picture of Booth-Harris to the witness, Detective Schwandt testified,

> Q. Why did you show him the picture then? A. Well, we just had a shooting in Burlington and there's a subject with a gunshot wound. We don't know if he's a victim. We don't know if he's a suspect. We don't know if he's a bystander, so at that time we're not sure what his involvement was.

triggering weapons focus. The encounter was brief. Watson stated during his interview two days later that everything happened quickly. It was a stressful and emotional event and the person who approached Watson was a stranger.

The majority argues that Watson could see the shooter from the nose to his forehead and the description of the shooter was largely accurate with the exception of the height estimate. In fact, there was no contemporaneous description of the shooter. The descriptions came during the time Watson was viewing photographs. There was no description about a sharp jawline until Watson was shown the photo of Booth-Harris. The only description provided regarding facial features was the light facial hair, an observation which is inconsistent with Watson's prior statement of being able to see the shooter's nose and forehead.[24] The eyes were described only during the viewing of the second and third photo arrays. In short, in the immediate aftermath of the crime when memory remains fresh, Watson described the shooter's clothes, height, and weight, not his face or facial features. That came later, and only when shown pictures by police and only after a one person showup presentation of Booth-Harris.

These facts demonstrate that Watson did not have a clear view of the face of the perpetrator, had a very limited opportunity to view what he could see, and was exposed to the distraction of the presence of a weapon.

2. *The use of a highly disfavored suggestive showup.* After being shown the array including Polk, Watson was shown a stand-alone picture of Booth-Harris. Detective Schwandt noted in his report that at the time

---

[24]During the police briefing following the execution of the search warrant of Booth-Harris's home, Detective Moret, the detective who lead the search, heard that the shooter wore "a mask covering part of his face."

he was "advised Earl Booth-Harris [was] currently at the Monmouth hospital speaking to Det[ective] Tripp because he also had sustained a gunshot wound to the leg during the incident."

At the time Booth-Harris's photo was shown, the officer was operating as if he may be a suspect. When asked why the photo was presented, the detective acknowledged that Booth-Harris may have been a suspect and they were trying to ascertain his role. The use of showup procedures calls into question subsequent identifications. "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identifications." *Simmons v. United States*, 390 U.S. 377, 383–84, 88 S. Ct. 967, 971 (1968).

Here, the use of the single picture was improper. There was no real urgency. Watson and the detective were at the police station, and Watson had already participated in one array. In Monmouth, Booth-Harris was at the hospital seeking medical care and was speaking to an officer. There is no excuse justifying the use of the highly suggestive process of a showup under the circumstances present. If the investigator had the time to secure a photo of Booth-Harris, knowing that he could be a suspect, the photo could have been put into an array or lineup with fillers. *See* Wells et al., *Policy & Procedures*, 44 Law & Hum. Behav. at 7.

Yet, even with the suggestive procedure, on the day of the shooting, when Watson's memory was the most accurate, he could not make the identification. When presented with the photo of Booth-Harris, he reported that he did not know who the person in the photo was. So, notwithstanding the highly disfavored process, no identification was made.

But by showing a single person to Watson, an element of suggestiveness was injected into the identification process.

3. *The improper double arrays, with a heavy dose of suggestion.* Two days after the shooting, when memory would have dramatically decayed, Watson was interviewed again by police. Sergeant McCune, who was not involved with the case, administered the lineup while Detective Tripp prepared it. Sergeant McCune read the photographic admonition before showing Watson the photos.

During the first photo array, Watson lingered on the photo of Booth-Harris and expressed some hesitancy to say definitively that Booth-Harris was the shooter. Watson expressed concern about his memory of the shooter's eyes and eyebrows versus those of Booth-Harris. He expressed concern regarding his memory of the shooter's height and weight versus those of Booth-Harris. Watson was able to say the "strong jaw structure" was something that he noticed in the shooter, and Booth-Harris appeared to have a jaw structure that reminded him of the shooter. Also, Watson stated that the jaw structure of the shooter was the "only thing he could kind of see." Watson concluded that array with a 50% certainty that Booth-Harris was the shooter, but also prefaced his 50% certainty with a statement to the administering officer that "[stuff] happened so quick."

At this point, the police did not have much. They had no contemporaneous description of the shooter, got a nonidentification in a highly suggestive one person showup, and got a 50% confidence identification when Watson was presented an array with Booth-Harris. The police elected to attempt yet a third identification process, another photo array.

In the new photo array, Watson, seeing Booth-Harris for the third time, identified Booth-Harris as the shooter with 70% certainty, noting

that "he doesn't know for sure, but the [stuff] just like match, the eyeballs and [stuff] like that." This response, though marginally better than the result in the first photo array, was hardly sufficient to overcome potential reasonable doubt. Rather than rest here, the police pressed on with a dialogue designed to push Watson to make a more positive identification. Sergeant McCune begins tapping repeatedly on the photo of Booth-Harris and exclaims "yeah." Watson now declared, "nah, I feel like that's him." Sergeant McCune then tells Watson that "feeling like it" is more than 70% certainty and then asks if they are more at 100% certainty, to which Watson replies, "might as well say 100." Watson is then asked to put 100% on the back of the photo and initial it.

The suggestiveness here is not inconsequential. As noted by one commentator, "[E]ven fairly minimal confirmatory feedback can significantly inflate a witness's assessment of her own confidence." Keith A. Findley, *Implementing the Lessons from Wrongful Convictions: An Empirical Analysis of Eyewitness Identification Reform Strategies*, 8 Mo. L. Rev. 377, 393 (2016). This case presents a classic example of highly inappropriate suggestiveness.

It is important to note that both Watson and Booth-Harris are African-Americans. Research shows we are better at identifying people of the same racial identity. Booth-Harris was a constant fixture among pictures of other black men with different skin tones, nose widths, and other Afrocentric features that Watson is attuned to recognizing. *See* Yair Bar-Haim et al., *Nature and Nurture in Own-Race Face Processing*, 17 Psychol. Sci. 159, 160 (2006) (discussing research for own-race advantage and why people tend to be better at recognizing own-race faces); *see also Doolin*, ___N.W.2d at ___ (discussing more research as it relates to

Afrocentric features, recognition, and impact on the criminal justice system).

Watson was exposed to Booth-Harris's photo on three different occasions after the shooting. Watson arrived at 100% certainly after three views, one of which was a showup where no identification was made; another at which Watson expressed doubt and eventually landed on a 50% certainty identification; and finally, in a remarkable third process, where police inquired whether Watson's clearly expressed 70% certainty should be something else, leading Watson to arrive at a 100% certainty.

To begin with, the impact of repeated exposures is extremely powerful:

> A prior viewing of a suspect at an identification procedure may reduce the reliability of a subsequent identification procedure in which the same suspect is shown. A prior viewing of a suspect in an identification procedure raises doubts about the reliability of a subsequent identification procedure using the same suspect.

*Gomes*, 22 N.E.3d at 916 (emphasis omitted); *see also Henderson*, 27 A.3d at 900 (stating that multiple viewings of a suspect can affect later reliability due to risk of being unable to discern the source of recognition); *Lawson*, 291 P.3d at 686–87 (same). Repeated exposure calls the identification into question. Watson was shown pictures of the same black male three times. To say Booth-Harris did not stand out is to ignore common sense and what science tells us. Tiffany Huinz & Kathy Pezdec, *The Effect of Exposure to Multiple Lineups on Face Identification Accuracy*, 25 Law & Hum. Behav. 185, 195–97 (2001); John S. Shaw III & Kimberly A. McClure, *Repeated Postevent Questioning Can Lead to Elevated Levels of Eyewitness Confidence*, 20 Law & Hum. Behav. 629, 630–31, 649–50 (1996).

Further, there can be no doubt that in the third identification process involving a photo of Booth-Harris, the exchange between Watson

and Sergeant McCune suggested to Watson that he could or should inflate his level of certainty from 70% to 100%. The State maintains this was not "encouragement" but instead an inquiry into what 70% certainty meant. An inquiry into what 70% certainty meant resulted in a 30% certainty increase and an expression of acquiescence in the form of the comment "might as well." If this was the case, why was there no similar inquiry into ascertaining what 50% certainty meant during the first identification? And when does "feeling like it," while at the same time saying, "I don't know for sure," equal 100% certainty?

The DOJ recommends administrators avoid words, sounds, expressions, and actions that suggest who the suspect is. Yates Memo, Procedure 8.1, at 5. Once an identification has been made, a confidence statement should be obtained. *Id.* Procedure 8.2, at 5. And only if the statement is vague, and 70% is not vague, is the administrator to ask for clarification. *Id.* Procedure 8.3, at 5. The DOJ provides examples of how further exploration should be obtained. Per the DOJ, the witness should be asked, "You said [I think it's #4]. What do you mean by that?" *Id.* The exemplary question of "what do you mean by that," and what happened in practice with tapping on Booth-Harris's picture and the statement of feeling like it is more than 70%, are two entirely different things. The only question presented was to the effect of "we're thinking we're more like 100%."

The conduct here is beyond any clarifying question or statement and is an explicit question to the witness to significantly increase his certainty to a level that a jury could not help but place great weight in. "[T]here is almost *nothing more convincing* [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders,* 449 U.S. 341, 352, 101 S. Ct. 654, 661 (1981)

(Brennan, J., dissenting) (quoting Elizabeth F. Loftus, *Eyewitness Testimony* 19 (1979)). Now, the State was able to say there is a witness who is 100% certain in his identification, when in reality he did not himself say he was 100% certain, but he accepted the suggestion of the officer. The suggestion is of 100% certainty. Those words and numbers are powerful. They were obtained in an impermissibly suggestive manner when the officer asked Watson if he was at 100% certainty and did not accept his initial answer of 70% certainty. To call this anything other than an encouragement to inflate his level of certainty is, at best, disingenuous.

4. *Testimony.* The majority also points to the testimony of Watson where he states he lied about not knowing Booth-Harris. But, the questioning continued beyond the portion cited in the majority opinion:

> Q. As a matter of fact, didn't Officer Schwandt show you a photo lineup that day? A. Yeah. Yes.

> Q. And did you identify Earl Booth-Harris from the lineup? A. I think it was, like, a 70 percent chance or something like that, and then I think he brought some other pictures in or whatever.

> Q. Isn't it a fact that he showed you Earl Booth-Harris' photograph all by itself apart from the lineup that day? A. I don't remember. I think it was all on one paper.

> Q. But, in any event, would you agree that if [Officer Schwandt] [showed a photo lineup], you didn't identify Earl Booth-Harris as the shooter on February 16th? A. Could you ask that question again.

> Q. Would you agree that you never identified Earl Booth-Harris as the shooter on February 16th? A. No, I did.

> Q. I'm sorry? A. I think I did, and I think I wind up reneging on it or something like that. I don't know.

> Q. Are you telling us that you don't know whether you identified him or not? A. The first time, like, yeah, I think I lied or something like that. Like, yeah, I -- I seen him, and then I went over the picture saying that I didn't see him.

Watson did not say that the person he failed to identify was Booth-Harris. Watson was familiar with Polk and was shown an array with Polk on the 16th. Watson was shown an individual picture of Booth-Harris on the 16th. He failed to identify either of them. Watson is confusing dates and lineups. On the 16th, Watson was presented with a lineup involving Polk, not Booth-Harris. Even more problematic, the jury may have been lead to believe that on the day of the shooting an identification was made and Watson reported his certainty at 70%.

The State argues that Watson remembered seeing the picture of Booth-Harris on the day of the shooting but declined to identify him because of fear of law enforcement. The fear of law enforcement reconciles with Watson lying about the gun on the day of the shooting, but not with his failure to identify Booth-Harris.

If Watson declined to identify Booth-Harris on the day of the shooting out of fear, why two days later did he identify him with 50% certainty during the first lineup? Why did his certainty only jump 20% when he saw him for the third time and only get to 100% after speaking with the Sergeant? If Watson had lied or simply failed to make the identification the day of the shooting, why did he not come in with 100% certainty after being presented with the first photo of Booth-Harris?

**III. Due Process Analysis Under the United States and Iowa Constitutions.**

This case involves the question of due process rights and eyewitness identification under both the Iowa and United States Constitutions. Under the Iowa Constitution, we "jealously reserve" the right to reach results different from the United States Supreme Court under our parallel provisions. *State v. Ingram*, 914 N.W.2d 794, 799 (Iowa 2018); *see, e.g.,*

*Zaber v. City of Dubuque*, 789 N.W.2d 634, 654 (Iowa 2010); *State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008).

The Fourteenth Amendment provides that no state "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Article I, section 9 of the Iowa Constitution requires that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Our caselaw states that "[a]lthough the Iowa and United States Constitutions have similarly worded [due process] provisions, that does not mean the two regimes and the cases under them may be conflated." *Ingram*, 914 N.W.2d at 799.

In *Doolin*, ___ N.W.2d. at ____, the United States Supreme Court precedent of due process and eyewitness testimony was thoroughly discussed by the dissent. The *Doolin* dissent noted that through the various cases before the Court, the reliability analysis focused on "a very substantial likelihood of irreparable misidentification." *Id.* at ___ (quoting *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971). It also focused on the role of law enforcement and their actions in the scope of due process analysis. It is an incredibly forgiving standard that was created over forty years ago.

Further in the Supreme Court analysis is the *Neil v. Biggers* and *Manson* framework. *See Manson*, 432 U.S. 98, 97 S. Ct. 2243 (majority opinion); *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 275 (1972). While these cases somewhat considered the application of scientific evidence, these decisions embraced a case-by-case, multifactor analysis that was ultimately uninformed by science. *See Doolin*, ___ N.W.2d at ____ n.4; Wells & Quinlivan, *Suggestive Eyewitness ID*, 33 Law & Hum. Behav. at 5 (noting the late 1970s is generally regarded as the birth of modern eyewitness research, and the work of researchers during that time did not appear in law reviews or other publications for legal consideration, but

instead appeared in peer-reviewed psychology journals). However, even before the explosive growth of science regarding eyewitness evidence, the role of misidentification in wrongful convictions was "well established" through Edwin Borchard's 1932 book, *Convicting the Innocent*, where Borchard claimed eyewitness errors were "perhaps a major source" of wrongful convictions. Nicholas A. Kahn-Fogel, *The Promises and Pitfalls of State Eyewitness Identification Reforms*, 104 Ky. L. J. 99, 107 (2016) [hereinafter Kahn-Fogel, *Promises & Pitfalls*] (quoting Edwin M. Borchard, *Convicting the Innocent: Sixty-Five Actual Errors of Criminal Justice* 367 (1932)). Before Bouchard, in 1908, Hugo Münsterberg penned *On the Witness Stand: Essays on Psychology and Crime* where the unreliability of eyewitness memory was demonstrated. *Id.* at 107 & n.43. Today we know even more with thousands of published and peer-reviewed studies and articles on eyewitness testimony. Why would we disregard them?

The issue isn't whether the identification would stand our current standard, the *Biggers/ Manson* test that has been determined to be unscientific and very forgiving. The majority's use of *Neal* demonstrates how forgiving the standard is. *See State v. Neal*, 353 N.W.2d 83 (Iowa 1984). In *Neal*, six days after the assault, the victim was shown photographs and made an identification that most closely resembled her assailant. *Id.* at 87. It wasn't until almost two weeks later, when she was shown another array with the defendant, that she identified him as her assailant. *Id.* at 89. The acceptance of this identification rejects the science the majority states they acknowledge. In *Neal*, the court calls attention to how "even rather startling differences" between the defendant and other fillers in arrays have not resulted in findings of suggestiveness. *Id.* at 88. The current standard fails to provide adequate protections by rejecting system and estimator variables.

Since the time of the *Manson* Court, social science has demonstrated how "unhelpful and flawed" the *Manson* factors are in the proper evaluation of witness reliability. Garrett, *Exclusion*, 65 Vand. L. Rev. at 468. This is especially troubling because the *Manson* Court emphasized that "reliability is the linchpin in determining admissibility of identification testimony." *Manson*, 432 U.S. at 114, 97 S. Ct. at 2253. Despite this extensive body of work, the Court has not revisited the *Biggers/ Manson* test for eyewitness reliability. In *Perry v. New Hampshire*, Justice Sotomayor, dissenting, discussed the incredibly high bar set for excluding eyewitness identification testimony and highlighted that there has been one case[25] at the time of the opinion where a due process violation was found. 565 U.S. 228, 261, 132 S. Ct. 716, 737 (2012) (Sotomayor, J., dissenting). Ultimately, the federal framework continues to ignore the mounting body of evidence that has "reinforced every concern [the Court's]

---

[25]*See Foster v. California*, 394 U.S. 440, 89 S. Ct. 1127 (1969). In *Foster*, the first lineup procedure involved three men: Foster, who was close to six feet tall, and two other men, who were approximately six inches shorter. *Id.* at 441, 89 S. Ct. at 1128. The witness during the lineup was unable to identify Foster and asked to speak with him in a room. *Id.* After the one-on-one confrontation, the witness was still unable to identify Foster. *Id.* A week or ten days later, the police arranged for the same witness to participate in a second lineup. *Id.* This time, there were five men present, and Foster was the only repeat between the two lineups. *Id.* at 441–42, 89 S. Ct. at 1128. After the second lineup, the witness was "convinced" Foster was the man. *Id.* at 442, 89 S. Ct. at 1128. The Court concluded the case presented "a compelling example of unfair lineup procedures." *Id.* The Court concluded that in the first lineup, Foster stood out because of the contrast of heights, the jacket he was wearing (a jacket that was similar to that worn by the robber), and the one-on-one confrontation. *Id.* at 442–43, 89 S. Ct. at 1128. Further, the Court highlighted that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 443, 89 S. Ct. at 1128–29 (alteration in original) (quoting *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537, 102 S. Ct. 2579 (1982)). After a tentative identification, another lineup was arranged, Foster was the only repeat in the first and second lineups, and only after all of this process was a definite identification produced. *Id.* The Court concluded that the suggestive procedure all but stated to the witness that "this is the man." *Id.* at 443, 89 S. Ct. at 1129.

precedents articulated nearly a half-century ago." *Id.* at 565 U.S. at 262–63, 132 S. Ct. at 738.

In Booth-Harris's motion to suppress the eyewitness testimony, he argued due process violations under the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. Recently, in *State v. Shorter*, 893 N.W.2d 65 (Iowa 2017), we specifically noted that the defendant did not raise a state constitutional challenge regarding the eyewitness identification evidence in his case. *Id.* at 74. Today we should address this issue and utilize science to take steps within our control to ensure due process under the Iowa Constitution when eyewitness evidence is proposed.

> [For] "the law will always lag behind the sciences to some degree because of the need for solid scientific consensus before the law incorporates its teachings . . . ." Appellate courts have a responsibility to look forward, and a legal concept's longevity should not be extended when it is established that it is no longer appropriate.

*Brodes*, 614 S.E.2d at 771 (quoting *Long*, 721 P.2d at 491). If reliability is truly the linchpin of admissibility, we must recognize and utilize the years of research that have shown the *Biggers/ Manson* framework is unreliable and outdated, leading to a lack of reliability. We have a scientific consensus on many issues that can be applied to safeguard due process rights.

A few states, in interpreting their state constitutional due process requirements, have explicitly rejected the *Biggers/ Manson* framework, and this court should follow their lead. As stated by Greg Hurley, Knowledge and Information Services Analyst for the National Center for State Courts,

> To protect the public from wrongful convictions based on an eyewitness misidentification, it is important that both law enforcement and the courts take notice of recent

developments on the issue in the social sciences. The courts must be aware of the malleable nature of human memory and the lineup practices used by law enforcement in the jurisdiction. Although they are downstream of the primary problem, *the courts have the power and duty to properly instruct jurors, the ability to refuse to admit evidence that does not meet a fundamental level of trustworthiness*, and the ability to work with justice system partners to improve the criminal justice system.

Gary Hurley, Nat'l Ctr. for State Cts., *Trends in State Courts: The Trouble with Eyewitness Identification Testimony in Criminal Cases*, https://www.ncsc.org/microsites/trends/home/Monthly-Trends-Articles/2017/The-Trouble-with-Eyewitness-Identification-Testimony-in-Criminal-Cases.aspx (emphasis added).

States are interpreting their due process clauses and are modifying how eyewitness identification testimony is used in trial. *See Young*, 374 P.3d at 412–28 (holding the *Manson* test does not adequately protect due process rights under the Alaska Constitution and utilizing scientific evidence in adopting a new approach); *State v. Harris*, 191 A.3d 119, 123, 133–45 (Conn. 2018) (reaffirming the due process clause under the state constitution provides greater protection than the Federal Constitution and utilizing other state precedent of estimator and system variables); *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1260, 1261 (Mass. 1995) (rejecting the *Manson* reliability test as an accurate interpretation of the state's due process clause); *State v. Adams*, 423 N.E.2d 379, 383–84 (N.Y. 1981) (rejecting *Manson* test under the state's constitution); *cf. State v. Lujan*, 459 P.3d 992, 1000–05 (Utah 2020) (utilizing scientific research in determining admissibility of eyewitness testimony under the Utah Rules of Evidence while reserving the possibility that the Utah due process clause may differ from the federal standard).

The majority cites *State v. Roberson*, 935 N.W.2d 813 (Wis. 2019), and their about-face in utilizing eyewitness science in determining

admissibility. The *Roberson* opinion focuses attention on social science and the role of social science in the application and interpretation of law. I agree with that assertion to a degree. Social science is characterized as a branch of science dealing with human behavior in its social and cultural aspects. Should courts use the social science that was utilized to endorse the theory of racial inferiority that was the catalyst for racist policy and judicial decisions? No. We must also recognize that the perception or "science" of inferiority had no scientific basis. Social science that helped shape racially discriminatory policy, as mentioned in *Roberson*, was based on physical characteristics and if someone was "well-born." *Id.* at 821–22. In recognizing that use of social science in judicial decision-making, we must also attribute social science's contributions to socially important decisions. *See id.* at 834 (Dallet, J., dissenting) (citing decisions leading to the decriminalization of consensual same-sex intimate conduct and the abolition of the death penalty against the mentally ill and juveniles).

Today, however, social science of societal beliefs is not the science I would rely upon. Eyewitness science utilizes studies that have a foundation in neuroscience and other disciplines, from studies that are reliable. Missing from both the *Roberson* opinion and today's majority is the research that calls into question the validity or reliability of the information presented, through methodologies that are tested and retested through various other methodologies. The science is sound and the wrongful convictions resulting from misidentification provide support to the notion that there is a problem with the way eyewitness identification testimony is handled.

This isn't the "social science . . . embod[ying] the subjective beliefs of the time." *Id.* at 822 (majority opinion). This isn't the same type of science that reinforced the beliefs and findings of *Plessy v. Ferguson*,

antimiscegenation laws, and forced sterilizations. *See Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138 (1896), *overruled by Brown v. Bd. of Educ.*, 347 U.S. 483, 495, 74 S. Ct. 686, 692 (1954). The science of eyewitness identification is not rooted in the subjective belief of superiority or inferiority, and this is not a societal value. It is based in how the brain perceives, how the brain recalls, and how the brain processes. In Justice Dallet's dissent, she stated that the majority, by abrogating *State v. Dubose*, 699 N.W.2d 582 (Wis. 2005), "erodes the due process protection afforded by the Wisconsin Constitution and places jurors in the impossible position of separating the taint of a suggestive single photo identification from its reliability." *Roberson*, 935 N.W.2d at 831 (Dallet, J., dissenting).

Under the current *Biggers/ Manson* factors, we are asked to balance the corrupting effects of a suggestive identification procedure against reliability factors that decades of research have indicated are unreliable. This practice is harmful to those who encounter our criminal justice system and does little to deter suggestive practices engaged in by law enforcement. Federally, "[t]he development of due process protections against mistaken identification evidence, begun in *Stovall*, was continued in *Simmons*" and has effectively ended in the *Manson* framework. *Manson*, 432 U.S. at 121, 97 S. Ct. at 2256 (Marshall, J., dissenting). "But, the Federal Constitution merely sets a 'constitutional floor' below which state constitutional interpretations may not sink." Mark S. Cady, *The Vanguard of Equality: The Iowa Supreme Court's Journey to Stay Ahead of the Curve on an Arc Bending Towards Justice*, 76 Albany L. Rev. 1991, 1992 (2013).

Iowa has a history of protecting those within our borders before federal courts reached the opposite or same conclusion. *See Varnum*, 763 N.W.2d at 906–07 (finding same-sex marriage equality six years before

*Obergefell*[26]); *Coger v. Nw. Union Packet Co.*, 37 Iowa 145, 153–54 (1873) (providing equality in public accommodations twenty years before *Plessy*[27] arrived at the separate but equal doctrine); *Clark v. Bd. of Dirs.*, 24 Iowa 266, 274 (1868) (desegregating public schools over eighty years before the *Brown*[28] decision); *In re Ralph,* 1 Morris 1 (1839) (extending equal protection to all men, regardless of color, and eighteen years before the Supreme Court reached the opposite conclusion in the *Dred Scott*[29] decision).

In *Wade*, the Court called attention to the "annals of criminal law [being] rife with instances of mistaken identification," of which we know now more than ever. 388 U.S. at 228, 87 S. Ct. at 1933. The *Manson* factors "are flatly contradicted by well-respected and essentially unchallenged empirical studies," and the "time has come for a more empirically sound approach." *State v. Ramirez,* 817 P.2d 774, 780 (Utah 1991) (quoting *Long,* 721 P.2d at 491–92), *abrogated by Lujan,* 459 P.3d at 999.

To provide due process, we must adjust and incorporate what we know to best facilitate a system that is fair and seeks justice. We simply cannot dismiss this expansive body of research. The Iowa Constitution provides a foundation for society and our interpretation fosters growth "consistent with the increasing knowledge and understanding of the world." Mark S. Cady, *A Pioneer's Constitution: How Iowa's Constitutional History Uniquely Shapes Our Pioneering Tradition in Recognizing Civil*

---

[26]*Obergefell v. Hodges*, 576 U.S. ___, ___, 135 S. Ct. 2584, 2608 (2015).

[27]*Plessy*, 163 U.S. 537.

[28]*Brown*, 347 U.S. 483, 74 S. Ct. 686, *supplemented sub nom.*, 349 U.S. 294, 75 S. Ct. 753 (1955).

[29]*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), *superseded by* U.S. Const. amend. XIV.

*Rights and Civil Liberties*, 60 Drake L. Rev. 1133, 1142 (2012). So the question is, what increased knowledge have we gained?

This is what we know. Eyewitness identification evidence is a leading cause of wrongful convictions, and mistaken identifications contributed to approximately 71% of the more than 360 wrongful convictions subsequently overturned by DNA evidence to date in the United States. Innocence Project, *Eyewitness Identification Reform*, https://www.innocenceproject.org/eyewitness-identification-reform/ [https://perma.cc/J2TA-5BHZ]. As devastating as these numbers are, they only tell us the number of those wrongfully convicted because DNA evidence was available to later testing. For many, there is no DNA evidence, whether the evidence is not preserved or the sample is not sufficient enough to test. The statistics only give us a snapshot of the wrongful convictions that occur in the United States. There are likely countless others who remain incarcerated or have faced a term of incarceration because DNA evidence was not available.

With all the information available about how sweeping this problem is and how, as a system, we can address the problem, we choose not to act. We perpetuate the illusion of due process and protection for those involved in the criminal justice system, and in doing so, we do nothing to curb the unacceptably high risk of wrongful convictions. Common sense is losing out to precedent, and convictions are held in a higher regard than the pursuit of truth.

In *Doolin*, I concluded that under the Iowa Constitution's due process clause, the wisest path forward regarding in-court identifications should a per se exclusion approach. *Doolin*, ___ N.W.2d at ___. First-time, in-court identifications would be inadmissible absent a prior identification made through nonsuggestive procedures. *Id.* In arriving at a per se

exclusion approach, I surveyed various states and what they are doing to combat unreliable eyewitness testimony. There, I discussed *Harris*, 191 A.3d 119. Under the Iowa due process clause, for eyewitness identification, I would adopt a methodology similar to that created under *Harris.*

In *Harris*, the Supreme Court of Connecticut determined that, although the defendant's due process challenge under the Federal Constitution fell short in light of traditional caselaw, the due process clause under the Connecticut Constitution required more. 191 A.3d at 123. While the court in *Harris* ruled the admission of the eyewitness identification testimony to be harmless error, the *Harris* court outlined a new science-based approach in determining admissibility under their state due process clause. *Id.* at 143.

The *Harris* court developed a procedural framework to consider eyewitness identification challenges. Finding the *Biggers* factors "insufficiently protective" of due process rights under their state constitution, the *Harris* court adopted a different due process framework. *Id.* at 133–43. Under the new framework, a defendant may obtain a pretrial hearing where the defendant carries the initial burden of offering "some evidence that a system variable undermined the reliability of the eyewitness identification." *Id.* at 143. The burden then shifts to the prosecution to show that the identification was reliable, accounting for all relevant estimator and system variables. *Id.* If the prosecution meets its burden, the burden shifts back to the defendant to prove a "very substantial likelihood of misidentification" in order for the evidence to be excluded. *Id.*

The defendant was entitled to challenge the eyewitness identification under the *Harris* framework. Based on the record in this case, I cannot

see how the eyewitness identification would have been admitted under *Harris* standards. Because the district court failed to utilize the *Harris* framework, I would reverse Booth-Harris's conviction and remand the case for retrial.

**IV. Ineffective Assistance of Counsel: Use of the ISBA Model Jury Instruction.**

**A. Introduction.** The jury was instructed using the ISBA Model Jury Instruction on eyewitness identification. Booth-Harris argues that his counsel should have requested jury instructions incorporating well-established system and estimator variables and that failure to do so constituted ineffective assistance of counsel. In addressing this claim, I begin by examining the history of the ISBA Model Jury Instruction 200.45.

**B. History of ISBA Model Jury Instruction 200.45.** The current ISBA instruction regarding eyewitness identification testimony is derived from *United States v. Telfaire*, 469 F.2d 552 (D.C. Cir. 1972) (per curiam). In *Telfaire*, the court commented on the "one witness rule"[30] and its role in Anglo-American jurisprudence. *Id.* at 554. *Telfaire* also commented on the power of the presumption of innocence and the adversarial system with safeguards to "dilute the danger of conviction of the innocent," a problem of concern for "every civilized system of justice." *Id.* at 554–55 ("The presumption of innocence that safeguards the common law system must be a premise that is realized in instruction and not merely a promise.").

In pursuit of that promise, the court recognized the importance for a special instruction with eyewitness identification emphasizing that eyewitness identification testimony involves special and heightened

---

[30]The one-witness rule recognizes that some crimes are solitary and allows for a case to be sent to a jury, and a verdict to be upheld, on the uncorroborated testimony of a single witness, and the witness need not be a victim. *See Strickland v. United States,* 332 A.2d 746, 749 (D.C. 1975).

problems of reliability. *Id.* at 555. The purpose of the instruction was to emphasize to the jury the importance and need to find the identification convincing beyond a reasonable doubt. *Id.* For jurors to find that, the *Telfaire* court embraced education as a means of achieving this goal. *Id.* at 557.

In Chief Judge Bazelon's concurrence, he recognized that the instructions went far in providing illumination to the shortcomings and pitfalls of eyewitness identification testimony, though he believed the instructions did not go far enough. *Id.* at 559 (Bazelon, C.J., concurring). Specifically, he called attention to the issues that arise in cross-racial identification, an issue not addressed in the special instructions. *Id.* Utilizing data, Chief Judge Bazelon called attention to the "widely held commonsense view" that cross-racial identification faces greater difficulty than same-race identification. *Id.* He recognized the danger as just "as relevant to the accuracy" of identification as other factors accounted for in the model instructions. *Id.* at 560.

Judge Leventhal authored a concurrence to address Chief Judge Bazelon's concerns regarding cross-racial identification. *Id.* at 561–63 (Leventhal, J., concurring). Judge Leventhal expressed concern that the issue of cross-race identification had not been developed enough to be addressed in the model instructions. *Id.* at 561–62 ("The issue of inter-racial identifications is not ripe for this kind of distillation of wisdom involving as it does a matter on which there is only 'meager data' and an assertion of 'common sense' views that merit further consideration."). In Judge Leventhal's view, the issue was a launching point to be used to identify a problem and, if needed, could warrant further discussion if it was an issue in a specific case. *Id.* at 563.

**C. Impact of Science on Eyewitness Identification Instruction.**

The *Telfaire* instructions were an "influential set of model jury instructions" to be used in appropriate cases involving eyewitness identification testimony. Nat'l Acad. of Scis., *Identifying the Culprit* at 41. These instructions added factors for the jury to consider in assessing eyewitness testimony. *Telfaire*, 469 F.2d at 558–59 (majority opinion) (outlining the model special instruction on identification); Nat'l Acad. of Scis., *Identifying the Culprit* at 41–42. Some states adopted the cautionary instructions, and Iowa was one that did. *See* Iowa State Bar Ass'n, Iowa Criminal Jury Instructions 200.45 (2018).

However, the *Telfaire* instructions fail to provide guidance on variables that reduce the reliability of identification procedures and ignore the issue of estimator and system variables that have since been identified as important reliability factors. *See* Kahn-Fogel, *Promises & Pitfalls*, 104 Ky. L.J. at 118–19. The instructions are still based on what was known in the 1970s. The instructions provide cautionary statements about some generalities regarding the witness's opportunity and capacity to view the perpetrator and identification procedure. *Id.* at 119–20; *Telfaire*, 469 F.2d at 558–59. Studies have shown the *Telfaire* instructions were ineffective safeguards against misidentification. Kahn-Fogel, *Promises & Pitfalls*, 104 Ky. L.J. at 119.

There is no doubt that the *Telfaire* jury instructions are no longer adequate in light of the scientific developments. Examples of scientifically based instructions may be found in *Henderson*, 27 A.3d at 894–912, 925–26, and *Gomes*, 22 N.E.3d at 907–17. There is no one version of an instruction that must be used in all cases, but I think it is abundantly clear that a criminal defendant, in cases where eyewitness identification is

involved, is entitled to a science-based instruction such as those presented in *Henderson* and *Gomes.*

**D. Ineffective Assistance of Counsel.** On appeal, Booth-Harris asserts that his trial counsel was ineffective for failing to request instructions incorporating well-established scientific information regarding system and estimator variables. Accordingly, the merits are analyzed through *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984).

The first prong requires an examination of whether trial counsel fell below a level of competence expected for a similar attorney. The question is whether a "normally competent attorney could have concluded that the question . . . was not worth raising." *State v. Fountain,* 786 N.W.2d 260, 266 (Iowa 2010) (quoting *State v. Schoelerman,* 315 N.W.2d 67, 72 (Iowa 1982)). A competent lawyer must stay abreast of legal developments to render effective assistance of counsel. *Id.*; *see also Doolin,* ___ N.W.2d at ___ (citing the Iowa Rules of Professional Conduct and how they require maintaining competence in changing and evolving fields).

Based on the above information, the eyewitness identification evidence controversy has been in the public and legal purview for over forty years. In *Telfaire,* Chief Judge Bazelon stated, "The jury's knowledge of the relevant factors should not turn on the inadvertence or inexperience of trial counsel, and this is particularly so where the issue of identity *is* the question of guilt or innocence." *Telfaire,* 469 F.2d at 560 (Bazelon, C.J., concurring). The accuracy of eyewitness identification testimony is routinely overestimated by jurors and the confidence of the identification often carries great weight with the juror. *Perry,* 565 U.S. at 263–64, 132 S. Ct. at 738–39. It falls to defense counsel to be well-informed and active in protecting their client's due process rights through knowledge of these

well-known and established fallacies of eyewitness identification and to inform the jury on both the best practices and pitfalls of eyewitness identification. *Gomes*, *Henderson*, and *Lawson*, to name a few cases, have addressed these issues at great length. Each case was also accompanied by either a special report or an appendix of scholarly work addressing the issues in question. *Gomes*, 22 N.E.3d at 918–27; *Henderson*, 27 A.3d at 894–912; *Lawson*, 291 P.3d at 695 & n.10.

Further, a veritable library on the question of science and eyewitness identification can be quickly developed by any lawyer through a computer search of commonly available legal databases. A search of "eyewitness identification" in the same sentence as "science" produces rich results with hundreds of hits, reflecting reliable, scholarly secondary literature of germane materials. Or, a search of "eyewitness identification" in the same sentence as "instruction" produces, again, hundreds of results, again, many highly germane. The information regarding eyewitness identification instructions is not stored in some kind of heavily guarded legal Fort Knox, or encrypted in some complicated and remote file of the national intelligence directorate. It is readily available to any lawyer with a modicum of curiosity, a mouse, and a few minutes time. There should be no lawyer practicing criminal law in the State of Iowa without a general knowledge of recent developments in the law and science of eyewitness identification. A lawyer without such knowledge has no place in an Iowa courtroom defending clients facing deprivation of liberty where eyewitness identifications are an important part of the State's case.

The remaining question is whether the failure to give a science-based instruction in this case caused prejudice. A review of the record makes it abundantly clear that Watson's identification was a critical part of the State's case. An appropriate eyewitness instruction would have

significantly enhanced the ability of the defense to challenge the credibility of Watson's identification, assuming it was admissible, and empowered the jury to more accurately assess the credibility of the identification.

Because of the weight jurors give eyewitness identification, it is imperative that the jury be instructed on the vital issues surrounding eyewitness identification. For example, a science-based instruction would have told the jury that human memory does not function like a camera; that a witness's expressed certainty, standing alone, may not indicate the accuracy of the identification; and that a prior viewing of a suspect at an identification procedure may reduce the reliability of any subsequent identification procedure. *See Gomes*, 22 N.E.3d at 918–27. Further, a science-based instruction would have educated the jury about estimator variables and would have, for example, (a) identified the issue of the disguise and how disguises affect a witness's ability to identify a person, (b) advised that an exposure of short duration limits the power of memory, (c) identified the distraction of weapons focus as a factor undermining the accuracy of the identification, (d) brought up the possible effects of Watson's intoxication on identification, (e) illuminated the importance of lack of familiarity with the suspect, (f) explored the role of memory decay in the accuracy of eyewitness identification, and (g) explained the risks of misidentification through contaminating suggestion.

The jury did not receive the information it needed regarding system and estimator variables so they could properly assess the weight of the evidence provided. The lack of a science-based eyewitness identification instruction in this case undermines my confidence in the verdict and is sufficient to satisfy the prejudice prong of an ineffective-assistance-of-counsel claim. *See Commonwealth v. Pressley*, 457 N.E.2d 1119, 1120–

21 (Mass. 1983) (reversing conviction based on failure to give adequate eyewitness identification instruction).

## V. Conclusion.

The majority opinion "persist[s] in wholesale reliance on an archaic test based on seemingly logical assumptions that have since been refuted." *Small v. State*, 211 A.3d 236, 256 (Md. 2019) (Barbera, C.J., concurring). They welcome a change in model jury instructions if the ISBA accepts the invitation. In the meantime, criminal defendants face conviction by juries that are woefully ill informed. The New Jersey Supreme Court put a stop to this kind of process in 2011. *See* Henderson, 27 A.3d at 918. Massachusetts has done so as well. *See* Gomes, 22 N.E.3d at 917–18. We should do the same today.

For all of the above reasons, I would reverse the conviction and remand the case.